**MANAGEMENT SYSTEMS ASSOCIATES, INC.,**
Appellee,

v.

**McDONNELL DOUGLAS CORPORATION,**
Appellant.

No. 83–2128.

United States Court of Appeals,
Fourth Circuit.

Argued Aug. 8, 1984.

Decided March 1, 1985.

Michael E. Weddington, Raleigh, N.C. (Smith, Anderson, Blount, Dorsett, Mitchell & Jernigan, Raleigh, N.C., on brief), and John I. Alber, St. Louis, Mo. (Robert M. Lucy, Bryan, Cave, McPheeters & McRoberts, St. Louis, Mo., on brief), for appellant.

G. Wynn Smith, Jr., Memphis, Tenn. (Glen G. Reid, Jr., Wildman, Harrold, Allen, Dixon & McDonnell, Memphis, Tenn., J. Jerome Hartzell, Akins, Mann, Pike & Mercer, P.A., Raleigh, N.C., on brief), for appellee.

Before RUSSELL, HALL and CHAPMAN, Circuit Judges.

DONALD RUSSELL, Circuit Judge:

This action is one in the diversity jurisdiction for (1) the recovery of additional royalty payments allegedly due the plaintiff (hereafter MSA) by the defendant (hereafter McAUTO)[1] under a contract between the parties, and for (2) a declaratory judgment construing specific anti-competitive language in that contract. In its response to the action, McAUTO asserted certain defenses including a number of counterclaims for alleged breaches of the contract on the part of MSA. The action proceeded to trial before a jury and, at the conclusion of the testimony, the district judge granted MSA's motion for a directed verdict against all of McAUTO's counterclaims, save one not involved in this appeal. He also submitted to the jury the proper construction of the disputed provision in the contract under MSA's declaratory judgment claim. The jury found in favor of MSA on the declaratory judgment action and returned a verdict in the amount of Two Hundred, Fifty-Six Thousand, Five Hundred ($256,500) Dollars, on MSA's claim for additional royalties. The jury denied any relief to McAUTO on its one counterclaim which was submitted to it by the district judge. After unsuccessfully moving for judgment notwithstanding the verdict (n.o.v.) and for a new trial, McAUTO has appealed from the judgment entered in favor of MSA. We affirm in part and reverse in part.

The facts giving rise to this suit are in many particulars undisputed. The parties were both providers of computerized hospital accounting systems. McAUTO's product consisted of large centralized "mainframe" computers, while MSA had developed a system using smaller, decentralized "minicomputer" software.[2] In the late 1970s, the minicomputer system had developed considerable customer appeal. McAUTO began planning to move into that field by marketing a minicomputer system of its own. With this in mind, it had acquired a manufacturer of minicomputer hardware. It, however, lacked software for its minicomputer hardware. Rather than producing its own software, McAUTO negotiated with MSA for the purchase of software from the latter under a licensing-purchasing arrangement. It is McAUTO's argument that, since the parties were competitors, the investigation by McAUTO of MSA's software preliminary to entering into any agreement with MSA was restricted. Because of this limitation on its investigation McAUTO's position was that it was forced to rely largely on MSA's own representations about the character and adaptability of the latter's software. In any event, the negotiations between the parties resulted in two related contracts, one a "Purchase Contract" covering the acquisition of the required software by McAUTO from MSA and the other a "Service Contract" in connection with such software. In this appeal we are only concerned with the Purchase Contract.

Under the Purchase Agreement, MSA agreed to sell, deliver, and license to McAUTO certain software, specifically described and identified in an exhibit attached and made a part of the Agreement. The

**1.** The defendant McAUTO is a subsidiary of McDonnell Douglas Corporation. Generally it was referred to as McAUTO in the briefs and we have followed this practice except in quotations where McDonnell Douglas appears in the text.

**2.** The differences between computer hardware and software are accurately described in Note, *Copyright Infringement of Computer Programs: A Modification of the Substantial Similarity Test,* 68 Minn.L.Rev. 1264, n. 1 (1984):

"Software is easiest to define as everything that is not hardware. Hardware is defined as the '[p]hysical equipment used in data processing.' *Science Research Assoc. Inc., Data*

*Processing Glossary* 127 (1979). Software generally comprises three classes of subject matter: computer programs, data bases, and documentation. Bender, *Licensing and Protecting Computer Software via Patents and Trade Secrets,* in I *Software Protection and Marketing Computer Programs and Data Bases; Video Games and Motion Pictures* 619, 621 (1983). All forms of computer programs are software. *See P. Seipel, Computing Law* 351 app. (1977). For the purposes of this Note, the terms software and computer program are used interchangeably."

license covered MSA's Hospital System together with any improvements thereof as well as the exclusive right to market such system subject to an exception in favor of outstanding contracts of MSA with a few identified hospitals. Under the Agreement MSA was also to grant McAUTO "a non-exclusive, non-transferable, perpetual, paid-up license for its 'Tool-bag' software." In payment for such purchase and license, McAUTO agreed to pay MSA Two Hundred Thousand ($200,000) Dollars, upon execution of the Purchase Agreement and One Hundred, Sixty Three Thousand ($163,000) Dollars, ninety (90) days following execution of such Agreement. In addition McAUTO agreed to make "Additional Payments" of royalties. It was contemplated that McAUTO would transfer, lease, and license the software. The royalty section of the Agreement applied to both sales and leases. In the instance of a lease, the Agreement provided (1) that a copy of the lease when executed was to be promptly furnished MSA and (2) that the "royalty" thereon was to be paid in advance on the sum of the monthly payments to be made under the lease much the same as if the lease had been a sale.[3] McAUTO proposed, and MSA agreed, that McAUTO should offer either to make an outright sale in the beginning or to do substantially the same by using a lease as a quasi-credit transaction, with payments spread over the period of the lease.

There were other provisions in the Agreement, whereby MSA bound itself under its license not to compete with McAUTO for a designated period of time. If, however, McAUTO did not reach a "minimum cumulative Bed Quota" in sales or leases for a particular year and failed to make the payment provided in lieu of attaining said "Quota," McAUTO was to grant MSA a "non-exclusive, paid-up license to MSA Hospital System in the general hospital market." Finally, MSA warranted that on the closing date it would have good and marketable title to all the properties and assets being sold to McAUTO and that there would be no claims against such assets preventing the transfer to McAUTO of clear title to said assets.

The two claims of MSA, one relating to the extent of its right to compete in "the general hospital market" on failure of McAUTO to reach its "Quota" under the Agreement and the other relating to the obligation of McAUTO to pay additional royalties to MSA, were based on the interpretations of certain provisions of the Agreement. In its first claim represented by its action for a declaratory judgment, MSA contended that the provision of the Agreement giving it the right to compete upon the failure of McAUTO to reach its "Quota" was not intended to confine it strictly to the solicitation of "end-users" or the hospitals, but was intended to be broad enough to embrace the solicitation of hospital suppliers.[4] McAUTO's construction was to the contrary. In its view MSA acquired a right to compete in marketing only with hospitals themselves as a result of McAUTO's failure to reach its "Quota." The resolution of this dispute turned on the construction of the term, "general hospital market" in the Agreement. Under the evidence at trial and the language of the Agreement, the district court found the term in question to be ambiguous; it therefore submitted the interpretation of the language to the jury. The jury found in favor of MSA's construction.

MSA's other claim was for additional royalties. MSA based such claim on its

---

3. The use of leases was agreed upon between the parties because McAUTO suggested that many hospitals either would lack the funds or would be unwilling to pay in full for the purchase of the system at the outset because of the rate of obsolescence in the computer industry. In fact, Barlow, MSA's representative in the negotiations testified that a lease was "about the only way you [could] handle" the marketing of computer equipment because "Hospitals will not buy 7, 10 or 15 years in advance. They aren't interested in that. There are too many changes going on [in computer technology]."

4. There is no dispute that McAUTO did not reach its "Quota" nor did it relieve itself of such default by payment of the default sum fixed in the Agreement.

construction of the term "paid-up license fee" in the royalty Article of the Purchase Agreement. MSA's position was that royalties under a lease of the system and its software were by the terms of the Agreement to be paid by McAUTO not on the gross sums to be paid by the lessee to McAUTO for the term of the lease itself but for the term of the so-called "useful life" of the system, which varied, under MSA's contention, from eight to twelve years. McAUTO, on the other hand, took the position that the obligation to pay such royalties extended only to the gross sums payable under the lease, discounted by excluding therefrom "financing charges." Under its construction, the term "paid-up" meant simply that the license fee under a lease was "paid up for the time [the lessees] had the right to use [the system]" under the lease-license. These conflicting positions represented a difference of between 60 months (if the lease controlled) or 96 months (if MSA's definition of "useful life" of eight years was used).[5]

During trial, MSA submitted an exhibit (Plaintiff's Exhibit 19) which it contended was taken from records and statements of McAUTO furnished to MSA by McAUTO and which it represented showed the amount of additional royalties due it under the terms of the Agreement. McAUTO objected to the introduction of such exhibit on the ground that it was based not simply on the records supplied by it to MSA but, more importantly, on an incorrect construction of the Purchase Agreement. In its view, the exhibit was therefore inaccurate and confusing. The district judge admitted the exhibit over McAUTO's objection.[6] Moreover, the district court submitted the challenged exhibit to the jury in connection with its determination of McAUTO's indebtedness, if any, to MSA for additional royalties and the jury returned a verdict in favor of MSA for the amount claimed by it as shown by the challenged exhibit.

McAUTO in turn raised affirmatively certain claims of its own against MSA. A number of these related to a charge of unfair competition on MSA's part. These consisted of charges against MSA of (1) holding out as its own and delivering to others software which was the property of McAUTO, (2) misappropriating certain of McAUTO's product descriptions of the software as its own, and (3) disparaging McAUTO's title. The district court granted directed verdicts in favor of MSA on all such claims. Other claims of McAUTO asserted breaches of contract on the part of MSA. The first of these alleged breaches was the failure to deliver essential parts of the system at the time provided under the Purchase Agreement. A second charged misrepresentation by MSA in falsely warranting that its system was "integrated." A third claim involved an allegation of a breach of warranty in that third parties had some claim to software sold by MSA to McAUTO under the Purchase Agreement. The final counterclaim of McAUTO raised the claim of a violation of the Agreement by MSA not to compete. The district judge granted a directed verdict in favor of MSA on all these charges of breach of contract.

---

5. Except for two leases for seven years, all the leases involved here were five-year leases.

6. Shippey, who supervised the preparation of the exhibit, testified that he had based the computations on material that had come "from McDonnell Douglas record." McAUTO objected, among other grounds, that the exhibit "contained some very important numbers which are not out of those records." On that objection, the district judge ruled:

"Well, apparently much of the material is admissible by agreement. It [referring to MSA] says it came from McDonnell Douglas records. But there are some specifying items in there concerning—which you think did not originate with the McDonnell Douglas records, and therefore you want to question those objections. I believe I will overrule the objection, but without prejudice to your right to explore any and all items concerning which you have a question by way of cross-examination. And then I will reserve the right to consider it in the light of whatever his [MSA's president's] testimony develops."

McAUTO followed the district judge's instructions but when it renewed its motion at the conclusion of the testimony, the objection was overruled without any statement of reasons for such ruling.

McAUTO has appealed, asserting error (1) in the admission of evidence of MSA's Exhibit 19 in connection with the royalty claim of MSA, (2) in the submission of the construction of the relevant contractual language in MSA's declaratory action and (3) in the dismissal by directed verdict of its claims of breach of contract and of unfair competition by MSA.

We find no error by the district court in the declaratory judgment action in submitting the construction of the relevant language of the Purchase Agreement to the jury and accordingly do not disturb the jury's verdict. Similarly, we do not fault the district judge's grant of directed verdicts on McAUTO's unfair competition claims. So far as the alleged breach of contract claims of McAUTO, we affirm the grant of directed verdicts by the district judge on all of these counterclaims except the one for damages on account of MSA's alleged failure to deliver certain of the equipment specified in the Purchase Agreement at the time agreed and the other alleging violation of the full disclosure warranty in failing to inform McAUTO that its (MSA's) system was not integrated. We also find error in the admission into evidence of MSA's Exhibit 19 in connection with MSA's claim for additional royalties. We shall address these findings of error separately beginning with the alleged error in the admission of MSA's Exhibit 19.

█ Plaintiff's Exhibit 19 was prepared under the direction of MSA's president, Kelley Shippey, Jr. It purports to be a summary of the amount of royalties due MSA by McAUTO under the Purchase Agreement, based on what Shippey testified were "[t]he computation documents that McDonnell Douglas had used in their assumptions in computing the payment [of royalty] that was due [on the various leases], copies of their checks, deposit records of checks that we [MSA] have received under the contract in the course of business, our own internal deposit records that we deposited it in the bank when we received them, when we deposited them." Had the supporting facts on which the summary in the exhibit was based been so limited, there probably could have been no objection to its admission, since it, following the "assumptions" used by McAUTO and dealing with the same records of payments as had been used by McAUTO in its calculations, would have reached the same result as had McAUTO and would have given MSA a claim merely for a trivial amount of interest arising out of delays in payment of the royalty in a few instances by McAUTO, an amount conceded by McAUTO.

The heart of the exhibit, however, was not these facts detailed by Shippey but the construction he gave to the provisions of the Purchase Agreement dealing with the payment of royalties by McAUTO and the effect of that construction on the records in evidence. This is so because MSA, in its summary exhibit, based its final calculations on two premises predicated on what it conceived to be the meaning of the section of the Purchase Agreement dealing with the payment of royalties by McAUTO. Unless both of the premises of MSA are correct, MSA's entire calculation of royalties, as stated in its exhibit, is incorrect and MSA would have no claim for additional royalties against McAUTO, except for the trifling sum due for delay in making payment in a few instances.

MSA's first premise under the Agreement was that the Purchase Agreement fixed—at least for purposes of calculating the royalty due—the term of the lease-license granted by McAUTO to any lessee-license hospital and the period of time over which McAUTO was to pay a royalty based on the monthly fee payments by the lessee-licensee as stipulated in the lease. To be more specific: MSA claimed that under the Agreement all leases granted by McAUTO, irrespective of what might be the rights between McAUTO and the lessee-licensee under the lease, were "perpetual" and that the payment of a royalty on the fee was to continue "in perpetuity," a term which MSA construed as synonymous with "useful life" of the system. This construction of the Agreement was vigorously disputed

by McAUTO, which argued that the clear intent of the Agreement was that McAUTO's obligation was to pay royalties only on what it was entitled to collect from the lessee-licensee and that, therefore, its liability for royalty on a lease was co-terminous in time with the term of the license granted under the lease and was to be based on the amount due to be paid it over the term of the lease.

The difference in result between these conflicting constructions of the relevant terms of the Agreement was substantial. If MSA's construction were adopted, the amount on which the royalty would be paid would be the monthly fee to be paid by the lessee-licensee under the lease multiplied by the "useful life" of the system, estimated in one calculation of MSA as eight years or 96 months, and in another as ten years or 120 months.[7] Under McAUTO's construction, on the other hand, the amount of the royalty would be computed on the monthly fee in the lease multiplied by the months in the term of the lease, which was generally 60 months or five years. Since the monthly fee was substantial, (generally in a range of about $2,000) the royalty calculated under the conflicting assumptions would vary markedly.

The second dispute between the parties concerns whether "financing charges" included in the monthly fee to be paid over the term of a lease by the licensee were to be excluded in calculating the royalty due by McAUTO, and if the "financing charges" were to be excluded, what interest rate was to be used in calculating the amount of such "financing charges." In preparing the exhibit, MSA, according to the explanation of Shippey, did not in one of its calculations make any effort to exclude "financing charges" from the fees on which royalties were computed and, in another, it claimed to have, though it used in this second calculation an entirely different estimate of "useful life" of the system. In

both instances it applied what it claimed was the "real rate of interest" as distinguished from the prevailing interest rate applicable to similar transactions in arriving at its present value result. Amazingly, it arrived at the same result in both calculations. McAUTO, on the contrary, asserted that the Purchase Agreement expressly provided for the exclusion of "financing charges" in making the royalty calculation and that, in arriving at the amount of such exclusion the proper interest rate to be used for "financing charges" was the prevailing market rate for similar transactions. Again, this difference between the parties would have a substantial impact on the amount of royalty due MSA by McAUTO in connection with leases of the system.

It is settled principle that the construction of the Agreement and its relation to the leases was one normally for the court itself. It follows that, whether the Purchase Agreement had the effect for which MSA contended or not was a question to be resolved by the district judge unless he should have found the language of the written documents ambiguous, in which event he should have left their construction to the jury under proper instructions. The district judge at no time ruled expressly on the construction of the contract nor did he submit the question of the construction of this part of the Agreement to the jury for resolution on the ground that the language of the Agreement was ambiguous.

In any event, when summaries such as this exhibit are offered in evidence the trial court "must ascertain with certainty that they [i.e., the summaries] are based upon and fairly represent competent evidence already before the jury," and accord with a proper construction of the applicable contract, since a contract is involved. *Gordon v. United States,* 438 F.2d 858, 876 (5th Cir.1971), *cert. denied,* 404 U.S. 828, 92 S.Ct. 63, 30 L.Ed.2d 56. The reason for

---

**7.** This estimate of Shippey on the "useful life" of a system such as that involved here was disputed by McAUTO's expert who testified that the advances in computations are "so fast" that a normal life of a computer system such as MSA's

would be "three, four or five" years. This estimate of McAUTO's witness finds confirmation in the fact that the hospital-licensees seem almost invariably to have refused to extend their obligation beyond five years.

denying admissibility of a summary, incorporating faulty assumptions, whether of fact or of a legal construction of the relevant contract, is correctly stated in *United States v. Conlin*, 551 F.2d 534, 538 (2d Cir.1977): "A chart [or exhibit] which for any reason presents an unfair [or inaccurate] picture can be a potent weapon for harm, and permitting the jury to consider it is error." It follows that in this case the district judge should have determined whether the two critical assumptions on which the exhibit in this case was based rested on a correct construction and application of the Purchase Agreement. Had he concluded otherwise he should have ruled the exhibit inadmissible. It may be assumed that the district judge had implicitly, though not expressly, found the construction given the terms of the Purchase Agreement on the payment of royalties was as contended for by MSA and that, therefore, in his view the exhibit was properly admitted. If the district judge in effect ruled the exhibit admissible because MSA's construction of the Agreement was, in his opinion, proper under the Agreement, the real question remains whether these crucial assumptions involving the proper construction of the relevant language of the Agreement on which this exhibit was constructed, were correct. If such assumptions were not correct, "permitting the jury to consider [the exhibit] is error," as *Conlin* said. Nor can there be any question that, if such construction was erroneous, McAUTO was prejudiced. This is clearly demonstrated by the fact that the jury's verdict was in effect the exact amount stated as due in the challenged exhibit.[8] It accordingly becomes necessary for us to determine whether these critical assumptions, which it would appear both the district judge and the jury unquestionably accepted, were correct. We begin by considering the construction of the language of the Purchase Agreement as it relates to the period over which McAUTO was obligated to pay royalties under a lease of the system executed by it in favor of a hospital-licensee.

In such consideration, we look first to the section of the Purchase Agreement which creates the obligation of McAUTO to pay royalties to MSA. That section comprehends the payment of royalties on purchases and leases, both of which were concededly contemplated by the parties. We are concerned only with McAUTO's obligation to pay royalties where it has granted a license to a lessee-licensee under a lease.[9] Such obligation is stated to be the payment of a royalty "equal to Six Per Cent (6%) of the sum of the purchase price of the hardware [to be installed] and the paid-up license fee for the software ('Lease Calculation')."[10] The controversy between the parties relates only to the language "the paid-up license fee for the software ('Lease Calculation')." Manifestly, the term "license" in the phrase refers to the "license" granted by McAUTO to the lessee-licensee. It appears equally obvious that the "fee" identified in the phrase is the monthly payment to be paid by the lessee-licensee to McAUTO under the lease. We do not understand there to be any disagreement between the parties on the correctness of these two assumptions. The lease itself, however, prescribes exactly how long the lessee-licensee is to make payments of the fee and for precisely what period of time the license granted to the lessee is to extend. Thus, the lease provided for payments of the fee by the lessee-licensee for a period of five years (or sixty months) and

---

**8.** The exhibit showed the additional royalty due as $256,478.18; the jury verdict on the issue was $256,500.

**9.** Practically all the transactions took the form of leases. The reason for this was that that was "about the only way you can handle it" because "hospitals will not buy seven, 10 or 15 years in advance. There are too many changes [in computer technology] involved." *See* Note 2, *supra*.

**10.** It will be observed that the provision makes a distinction between "the hardware" and "the software." The "hardware" is to be valued for royalty purposes at "purchase price." The contract between MSA and McAUTO concerned the "software," the royalty on which was fixed by "the paid-up license fee."

fixed the temporal extent of the license as the same five years during which the lessee-licensee was making its payments.[11] Moreover, the Agreement provided that any obligation of McAUTO to pay a royalty did not accrue or begin until "the 20th day after the following month" when McAUTO had received its first monthly payment from the lessee-licensee under the terms of the lease. Shippey testified in this connection that MSA "would not expect to be paid [royalties] before revenue begins to accrue to McAUTO." [12]

In summary then, both parties are in agreement (1) that the term "license" refers to the license granted under the lease made by McAUTO with a hospital-lessee, and the term "fee" refers to the monthly fee to be paid by the lessee-licensee thereunder and (2) that any obligation of McAUTO to pay royalties under any lease-license is only to begin when McAUTO begins to receive payments from the lessee-licensee under the lease—in short, McAUTO's obligation to pay royalties is directly related to and accrues only as it (McAUTO) receives payments from a lessee-licensee.

Though MSA thus accepts the lease-license as controlling in all these regards and even though it recognized that McAUTO's obligation was substantially related to the right of McAUTO to collect from its lessee-licensee, MSA's position, as we have seen, is that the length of McAUTO's obligation to pay royalties on the monthly payments stipulated in the lease was not controlled or fixed by the provisions of the lease, but that the length of McAUTO's obligation to pay royalty under any lease was "perpetual" and continued "for eternity." In essence, then, MSA conceded that the amount of the royalty in every detail was fixed by the terms of the lease except the length of time over which the payments of the fee was to extend. As we have seen, it premised this contention on the fact that the Purchase Agreement stated that the royalty should be calculated on the "paid-up license fee;" it would read as implicit in this term "paid-up" the meaning of "perpetual." Following up on this construction of the term "paid-up" MSA argues that the amount of royalty to be paid under any lease by McAUTO should be calculated on the assumption that the payment of the monthly license "fee" was to be a "perpetual" one. Obviously, it would be impossible to make such a calculation based on payments "for eternity;" therefore, MSA would define "perpetual" as meaning for the "useful life" of the system, a term which in itself is indefinite under MSA's testimony that the software's "useful life" is between eight and fifteen years.

In McAUTO's view, on the other hand, the term "paid-up license fee" in the Purchase Agreement is easily understood when read in the light of other provisions of the Agreement. It would find that "paid-up" refers unquestionably to the license granted under the lease. Admittedly, the license under the lease was a five-year license and not a "forever" license, as MSA contends. McAUTO further pointed out that while the amount of the royalties under the lease was to be based on the monthly fee payments by the lessee-licensee for the license, the parties had agreed that when the fee payments began under the lease, McAUTO was to pay in *advance* the royalty for the entire amount of the monthly fee payments over the full period of the lease between McAUTO and the lessee-licensee (i.e., for five years).[13] This

---

**11.** With the exception of two leases, which were for seven years, all of the leases were for a term of five years. For that reason, we use the five-year-term generally throughout this discussion.

**12.** Shippey was asked during his testimony whether it was not true "that you would not expect to be paid before revenue begins to accrue to McAUTO." His answer was: "That is correct, yes, sir."

**13.** This payment of the royalty in advance was explained by one of McAUTO's witnesses:

"In fact, it was kind of a concession on our part that we would pay him (referring to Shippey) all of his money (i.e., royalty) right up at the beginning, and if we lost that client after the first year, although we had paid royalty for five years, that he (referring to Shippey) was not to return any. We had a risk involved."

construction of McAUTO's obligation is not contested by MSA. McAUTO was thus assuming the risk that the lessee-licensee would fully honor its obligation under the lease and was making payment of royalties on the lease in advance on that basis. Because the royalty was to be paid in advance on the monthly payments or fees the lessee-hospital was to make over the entire term of the lease, it was necessary to calculate the fees that the lessee-hospital would pay over the full term of the lease. That calculation, when made on the basis of the length of the license as stated in the lease, would constitute a "paid-up license fee" on which the royalty, to be paid in advance, could be computed, after deduction of financing charges, at the agreed six percent rate. In summary, McAUTO contended that "paid-up" simply denoted that a lump sum had been paid at the commencement of the license period and that no further sums by way of royalty were due during the term of the license, whatever the term might be. This, McAUTO urges, is the obvious meaning and intent of the full phrase "paid-up license fee." And McAUTO calculated on this basis the royalty due on each lease as payments began thereon and made payment to MSA accordingly. Further, MSA knew this was the way McAUTO was construing its obligation to pay royalties under the leases it negotiated and it accepted from McAUTO payments on this basis for a year and a half before it (MSA) raised the claim it asserted in the exhibit.[14]

There is another fact that strongly supports the construction that the term of the lease fixes the term of McAUTO's obligation to pay royalties under the lease and that MSA's construction of "paid-up license fee" would render performance under the Agreement unreasonably difficult, if not impossible. As we have said, McAUTO was to pay the royalty under each lease in advance for the full term of the license. If the period for which McAUTO was to pay an advance royalty on the monthly fee due by lessee-licensee was not to be for the term of the lease, but was to be for the "useful life" of the system, there would have arisen the problem of how the advance royalty could possibly be calculated since there is nothing in the Agreement to indicate what "useful life" is (in fact, "useful life" nowhere appears in the Agreement) and in the two instances where MSA was making its computations in the exhibit, it (MSA) used two different estimates of "useful life." Manifestly, if the parties had intended McAUTO's obligation to pay royalties on the fees collected under a lease to run for years beyond the life of the lease and for what MSA called "useful life" it would appear reasonable to assume the parties would have included in the Agreement some statement of what "useful life" was and would not have left the matter dangling uncertainly in the air. Absent such definition, it would have been impossible to calculate the advance payment of royalties called for under the Agreement. It was accordingly reasonable to assume, as McAUTO contends, that the Agreement meant McAUTO's obligation to pay royalty was related to and depended for its calcula-

---

**14.** In this court but, so far as our review of the record reveals, not in the district court, MSA raises as an argument against McAUTO's contention that the leases all had a provision for extension at the end of the term at the option of the hospital-licensee. It urges that this would indicate that the express term of the lease did not fix the amount of McAUTO's payment of the royalty to be made in advance. Of course, it is true that McAUTO was not to pay in advance on the assumption that the lease-license would be extended for a time not to be determined until the hospital-licensee exercised its option to continue the lease. It would have been impossible to make such an advance calculation since,

whether the lease and license were extended would depend on whether at the end of the lease period, the lessee-licensee exercised the option to extend. And the parties did not expect this fact to warrant failure to pay in advance the royalty for the express term of the lease. If the lease was at its expiration continued, then, in keeping with the purpose of the Agreement, McAUTO would be obligated at that time to pay an additional royalty on the fees to be received under the extended period of the lease. But any such obligation would be merely a contingent obligation and has no effect on the issues now being resolved.

tion on the term of the license stated in the lease.

■ In resolving this dispute over the construction of the Agreement on the period over which McAUTO was to pay royalties on the fees prescribed in a lease, it is important to look to the construction initially adopted by the parties on the pertinent provisions of the Agreement. It is undisputed in the record that MSA had received from McAUTO for over a year and a half copies of all leases made by McAUTO under the Agreement, accompanied as these copies of the leases were by statements showing the advance royalty payments due under such leases.[15] These statements were accompanied by checks of McAUTO in payment of the advance royalty due on each lease. The statements showed unmistakably that the advance payment was based on the term of the license as fixed in the leases, i.e., that the advance royalty was calculated on the expected payment of the stipulated monthly sums for—but only for—the term provided in the lease for the license or for 60 months. Shippey, MSA's president, said he fully understood this.[16] When MSA received these advance payments, the calculations of the amount of the advance royalty due under the leases in question were made by MSA, using the same formula McAUTO had used. In an instance or two, MSA claimed to have found a few minor errors in the calculations and registered on the statements the difference between its calculations and those of McAUTO. However, as we have said, both McAUTO and MSA used the same method of calculating the royalty due. Neither used the period of eight or ten years (the period of time which, according to MSA represented "useful life" of the software) as the appropriate period for calculating the total of the monthly payments on which the royalty was to be paid. To repeat: Both parties employed the term of the lease or five years as the period during which the monthly payments were to be aggregated in arriving at the "paid-up license fee" under the leases. Even at trial, Shippey practically conceded that it was understood that McAUTO's obligation to pay royalties on leases of the system was to be based on the terms of the lease.[17]

Such construction by the parties of the Agreement and the leases are entitled to "great, if not controlling, influence" in the construction of the meaning of the Agreement on MSA's claim for additional royalties. This was the rule of construction adopted by the United States Supreme Court many years ago in *Old Colony Trust Co. v. Omaha*, 230 U.S. 100, 118, 33 S.Ct. 967, 972, 57 L.Ed. 1410 (1913):

"Generally speaking, the practical interpretation of a contract by the parties for any considerable period of time before it comes to the subject of controversy, is deemed to be of great, if not controlling, influence."

The North Carolina rule, (which is controlling on the construction of the Agreement in this case, *Fried v. North River Insurance Co.*, 710 F.2d 1022, 1024 (4th Cir. 1983), is to the same effect. Thus, in *Mas Corp. v. Thompson*, 62 N.C.App. 31, 302 S.E.2d 271, 275 (1983), the court, citing a long line of North Carolina cases, said that "[s]ubsequent conduct of the parties, after executing a contract, is admissible to show intent." Even more definite is the oft-quot-

---

**15.** These are the very documents which MSA disingenuously stated it had used as the basis for its Exhibit 19.

**16.** Shippey's testimony on this point was as follows:

"Q. There is no question, though, in your mind that at least early on that you were aware that when McDonnell Douglas was making the calculations that they were basing the calculations on the term of the lease rather than on your term, as you have stated in Exhibit 19?

"A. Sure. There is no doubt in my mind.
"Q. No question?
"A. No. That was never a question."

**17.** Shippey testified in this connection as follows:

"Q. So you understood, did you not that the calculation was to be based upon the lease that was involved?
"A. That there would be a calculation based upon the lease, but that it would be the same as if it had been a straight sale."

ed statement of Chief Justice Stacy in *Cole v. Fibre Co.*, 200 N.C. 484, 157 S.E. 857 (1931):

> "The general rule is that, where, from the language employed in a contract a question of doubtful meaning arises, and it appears that the parties themselves have interpretated their contract, practically or otherwise, the courts will ordinarily follow such interpretation, for it is to be presumed that the parties to a contract know best what was meant by its terms, and are less liable to be mistaken as to its purpose and intent...."

To paraphrase *Old Colony*, the interpretation of the formula for calculating the sum on which royalties were to be paid by McAUTO as followed by McAUTO with the full knowledge of MSA and in the absence of any claim of a license in perpetuity until after this suit was begun, is entitled to "great, if not controlling, influence" in construing the contract. MSA's excuse that it did not object to McAUTO's method of computing the royalty due on each lease because it did not understand McAUTO's calculation is belied by the fact that, in checking these calculations of McAUTO, MSA apparently used the same formula as had McAUTO.

■ To adopt MSA's argument on the construction of the Agreement would be to impose an obligation on McAUTO to pay royalties on purely phantom, fictitious license fee payments, payments which were neither to be made by the lessee of the system nor to be collected by McAUTO. Such a construction, in contrast to that which was pressed by McAUTO, would give to the Agreement an unreasonable construction, contrary to common sense. It is a general rule of contract construction that "[w]hen a contract is fairly susceptible of two constructions, one which makes it fair and customary and which prudent persons would naturally enter into while the other makes it inequitable, the former interpretation must be preferred to the lat-

ter." *Bank of North Carolina v. Rock Island Bank*, 570 F.2d 202, 207 (7th Cir. 1978). And such is the rule in North Carolina, *DeBruhl v. State Highway & Public Works Com.*, 245 N.C. 139, 95 S.E.2d 553, 557 (1956); *Burwell v. Griffin*, 67 N.C. App. 198, 312 S.E. 917, 921 (1984). In *DeBruhl*, the court said: "All instruments should receive a sensible and reasonable construction and not such a one as will lead to absurd consequences or unjust results." In *Burwell*, the court, relying on *DeBruhl*, repeated that "instruments should receive sensible and reasonable constructions and not ones leading to absurd consequences or unjust results." Certainly a construction of the Agreement under which McAUTO would be required to pay royalties on a license fee for years after the license had terminated and while McAUTO was receiving no license fees would be absurd, unfair, and unjust. The contrary construction, which would limit McAUTO's obligation to the period under the lease when it could be expected it would receive payments from the lessee-licensee is one "to be preferred."

Finally, MSA's argument that "paid-up" is the common term in the computer vocabulary for "perpetual" and is the definition to be given the term in this Agreement is inconsistent with the language of the Agreement and its related documents executed as a contemporaneous part of the transaction between the parties.[18] The word "paid-up" is used a number of times in the Agreement and the related documents. In some instances it is used alone; in other instances, it is preceded by the word "perpetual." If "paid-up" by itself meant "perpetual" there would have been no reason for the parties to the Agreement to have explained that term at any point in the Agreement or its related documents contemporaneously executed, by adding by way of explanation "perpetual." The addition of "perpetual" to "paid-up" in some instances and its omission in other instances in the Agreement, demonstrates that the

---

**18.** The rule is that all contemporaneously executed written instruments between the parties relating to subject matter of the contract, are to

be construed together in determining intent and the undertaking of the parties. *Yates v. Brown*, 275 N.C. 634, 170 S.E.2d 477, 482 (1969).

drafters of the Agreement understood and intended to distinguish between those instances when it intended the "paid-up" to include the meaning of perpetuity and when it did not.[19] The omission of the adjective "perpetual" in the critical sentence under review accordingly adds further weight to the conclusion that the term "paid-up license fee" was to be given the construction adopted by McAUTO and at least acquiesced in by MSA for some time after performance under the Agreement had begun. Further, the Agreement summarizes the royalty obligation of McAUTO under a lease with the phrase "Lease Calculation." This phrase definitely tied McAUTO's royalty obligation to the lease, in the calculation of the amount of the royalties. Such tie-in covered not only the amount of the fee but the term it was to be paid as stated in the lease. That is the only reasonable construction of the term ("Lease Calculation"), as used in this construction and MSA suggests no other.

■ In summary, we conclude that the period for determining the amount of royalty due under the lease is limited to the period of the license as granted in the lease and does not continue beyond the expiration date of the lease. This we think to be the fair and sensible construction of the pertinent language of the Agreement, read in conjunction with all the provisions of the Agreement, and it accords with the practice of the parties until this suit was filed. And

such should have been, in our opinion, the construction given the relevant documents by the district judge, to whom ordinarily the construction of contracts is committed. Moreover, if it were thought that the construction of the term "paid-up" was ambiguous or that there was a dispute in the evidence on the meaning of the term (as there was), the issue of the proper meaning was one for the jury. No such issue was submitted to or resolved by the jury.

■ We now turn to MSA's calculation of "financing charges" as set forth in its Exhibit 19. There would seem to be no question that "financing charges" connected with the lease charges or fees were to be excluded in the computations of the royalties under the leases. The Purchase Agreement so provided in specific language:

"The purchase price for the purpose of calculating the additional payment (or the calculation of an amount when a lease is involved) shall not include financing charges...." [20]

Moreover, Shippey clearly understood that "financing charges" were not to be included in the sum on which royalties were to be paid. He so testified:

"Q. .. And the contract clearly says that financing charges are not to be included (in the calculation of royalties).

"A. That is correct."

---

19. Thus, when the parties intended the "paid-up license fee" to be a perpetual one, they knew how to express it: In those instances, they declared it to be a *"perpetual* paid-up license" in *haec verba,* not in some linguistic obscurantism. They did this in connection with the "paid-up license" issued pursuant to Article VI "in the form of license shown as Exhibit D" attached to the Purchase Agreement. Exhibit D used the term "paid-up license" but that designation was plainly not the equivalent of "perpetual," otherwise it would not have been necessary for the parties to provide later, as they did: "This [paid-up] license shall be a perpetual license." Again, in Article IX of the Agreement there was a provision for a "Toolbag License" in favor of McAUTO. This was to be not simply a "paid-up" license but a "perpetual" one and so the license was stated to be a "perpetual paid-up license." Accordingly, when the parties in the Agreement

wished to attach the characteristic of "perpetual" to a "paid-up" license, they did so by expressly declaring the "paid-up license" to be "perpetual."

20. The reason for this exclusion was explained in the testimony of Barlow, who represented McAUTO in the negotiation of the Agreement. His testimony on this point was not disputed by MSA. His explanation was:

"We excluded those where we had costs involved, including the financing charge. We were putting all of the money up, we, being McAUTO, and therefore, we had the cost of money involved. MSA was not requested to finance, put up money, to finance. Therefore, they didn't get a part of that. And that charge was usually equal to approximately the going rate in the market for money at the time."

It is thus clear that "financing charges" were to be excluded from the calculation of the royalty under a lease by the express language of the Agreement. The only question in this regard thus was what was an appropriate rate of interest to be used in calculating such financing charge. We accordingly turn to that question.

In explaining the manner of arriving at the amount on which the royalty was calculated in the exhibit, Shippey initially offered as his method for making such calculation: The multiplication of the monthly fee stipulated to be paid by the lessee-licensee under the lease by what he assumed to be the "useful life" of the system, which he took as 96 months or eight years.[21] Although Shippey in his testimony had conceded that the "financing charges" were under the express language of the Purchase Agreement to be excluded in calculating the royalty, this method of calculation adopted by Shippey admittedly did not exclude "financing charges" from the sum on which the royalty was calculated. When this fatal omission was called to Shippey's attention he testified that he had made another calculation of the royalty due

by McAUTO. In this second calculation, he assumed the "usual life" of the system to be ten years or 120 months. He then claims that he assumed that "the real interest rate" which he found to be 4.5 percent was the proper interest rate to be used in calculating "financing charges" and, after "factoring" this interest rate into ten years or 120 months, he arrived at 96.8 or 96.9 months as the proper time period, expressed in months, with which to calculate the sum on which royalty was to be paid. He discarded the fractions and took 96 months which he multiplied by the monthly fee, realizing precisely the same result as he had reached when he made his calculation without any exclusion of "financing charges."[22]

The reason for this amazing result is that Shippey in his second calculation raised the assumed "useful life" of the system by two years (i.e., to ten years). If in his second calculation, Shippey had used the same "useful life" estimate as he had in his first calculation, the number of months to be used in calculating the sum on which royalty was to be paid would have

**21.** Under a lease providing for a monthly fee of $2,000, the sum on which the royalty would be calculated under this formula would be $2,000 × 96 or $192,000.

**22.** We find somewhat confusing Shippey's explanation of his calculation of "present value." In his testimony he left the explanation obscure. We quote his exact testimony to indicate its obscurity and confusion:

"Now, it is a real simple fact that the true interest rate that is charged in any kind of lease is a difference between the market interest rate being charged at the current time minus the inflation rate. If I can give you an example, at the risk of boring the court, if you wanted to borrow—excuse me, sir. Do you want me to wait? . . . . . . . . .

"I went to a document called a statistical abstract of the United States, which is an official government publication, and I looked up the market—free market interest rates in 1980 and 1981 and the first half of 1982. Out of that same document I looked at the inflation rate of the consumer price index. And I subtracted the two to try to work out a true interest rate.

"In 1980 it turned out to be- 1 percent, 1-point-something percent. In 1981 it turned out to be 4.9 percent. In the first half of 1982 it turned out to be 6.6 or 6.7 percent. In an

attempt to get a fair average interest rate, I looked at those three numbers and said, 'it looks like to me about 4.5 percent, if you looked at it over the period of time, a fair true interest rate.'

"I applied that 4.5 percent discount factor to a 10-year license, which I believe is a more probable life of a contract, and I made a present value computation, and it came back not to be 96. It came back to be 96.8 or 96.9. So I took what I considered to be a new, a conservative and defensible number to use as an estimate of what a paid-up license is really worth.

"Q. All right. Mr. Shippey, the question that I want to present to you is did you multiply 96 times 1,708 under the university heights and come out with a sum or a multiple of $163,968.00?

"A. Yes, sir. I absolutely did.

"Q. There is no other calculation on that sheet except a straight multiplication of 96 months times the software license? That is the way this sheet reads, isn't it, sir?

"A. It certainly does. It is very simple."

McAUTO offered evidence of its calculation of "present value" following more orthodox and traditional formulae.

been considerably less than those used in his first computation and the result in the two tests would have been considerably different. Shippey offered no explanation for using different time periods in his two calculations, though it is manifest that he altered the time frames in order to reach the same result in both calculations. Whether this was a reasonable or acceptable way in which to attempt to fix a party's liability seems not open to question.

We find equally erroneous the use of the concept of "real interest rate" as the proper rate of interest to have been used in this connection. As we have said, MSA discarded prevailing market rate in determining the proper charge for a lease, where McAUTO advanced the equipment to the lessee without any "down-payment" and where it paid MSA in advance the full royalty as if the full payments under the lease had been already made. It argued that the only interest allowable in the circumstances was what it characterized as "real interest rate." The flaw in the argument of MSA in this regard is its failure to recognize that "real interest rate" is seldom, if ever, the actual rate charged on any loan or discount transaction; in fact, "real interest rate" is a doubtful concept at best. Courts, in calculating the present value of funds to be received in the future do so "by discounting the future sum by a market interest rate," not by any so-called "real interest rate." Note, *Inflation, Productivity and the Total Offset Method of Calculating Damages for Lost Future Earnings,* 49 U.Chi.L.Rev. 1003, 1005 n. 5, 1009 (1982). Particularly is this so in a period of super-inflation such as was the situation during the period in issue here. Actually, the term "real interest rate" is a concept used by economists as simply one of the components in stating actual interest rate. These components are, as set forth by Judge Posner in his authoritative text, *Economic Analysis of Law,* § 6.13 at 147 (2d ed. 1977), (1) the risk involved, (2) the expected inflation, and (3) the real interest rate. Accordingly, then, "real interest rate," as used by economists, is the return on money after adjustment for risk and

inflation, or, as the writer in the Note, *Inflation, Productivity and the Total Offset Method of Calculating Damages for Lost Future Earnings,* 49 U.Chi.L.Rev. at 1009, said, "it is the rate lenders would charge when lending the money to a risk-free venture in an inflation-free economy." But the Supreme Court aptly warned in *Jones & Laughlin Steel Corp. v. Pfeifer,* 462 U.S. 523, 538, 103 S.Ct. 2541, 2551, 76 L.Ed.2d 768, 784 (1983):

> "Unfortunately for triers of fact, ours is not an inflation-free economy. Inflation has been a permanent fixture in our economy for many decades, and there can be no doubt that it ideally should affect both stages of the calculation described in the previous section."

This same point was made at greater length by Judge Blumenfeld in *Feldman v. Allegheny Airlines, Inc.,* 382 F.Supp. 1271, 1289 (D.Conn.1974), *aff'd.,* 524 F.2d 384 (2d Cir.1975), a decision commented on by Justice Stevens in *Pfeifer:*

> "The problem of determining a fair discount rate is the difficulty of anticipating what effect inflation will have on interest rates.... It is abundantly clear, however, that one risk the federal government cannot extend a guarantee against, to its creditors or to its citizens, is inflation.... Expectations of inflation have accordingly driven up present interest rates to historic heights, even on 'risk-free' obligations. Thus the evidence adduced at trial showed that the yield on one of money market's standard measures of a 'risk-free' rate of return, a three-month treasury bill, was 2.93 percent in 1960 and 8.57 percent in 1974."

It follows that it is completely *unrealistic* to speak of using the "real interest rate" in fixing the reasonable "financing charges" or discount in a credit transaction conducted in an inflation-laden society, as conditions were when the leases involved here were negotiated. The absurdity of using 4½ percent as a reasonable and fair rate of interest is demonstrated by the fact that the rate of inflation alone in 1981 and 1982 was several times that rate. The

adoption of such rate would consequently result in the allowance of *no* "real interest" to McAUTO—indeed, in denying to it even the rate of inflation. This is not to say that McAUTO's statement of the prevailing market interest rate applicable to this unique type of lease was exactly that stated by McAUTO in its various accountings. What we do say, though, is that the interest rate used by MSA in its Exhibit 19, i.e., the "real interest rate" of 4½ percent, was improper and palpably erroneous.

■ To repeat: Exhibit 19 unfairly and improperly purported to calculate the royalties on the basis of two vitally important faulty assumptions: First, it calculated the life of the lease to be from 50 to 100 percent greater than the terms of the leases themselves (i.e., from either 96 or 120 months against the lease terms of 60 months); secondly, it calculated the "financing charges" or interest discounts on the leases under a completely erroneous formula and by using a completely unreasonable and inaccurate interest rate. Moreover, even MSA's estimate of the "reasonable life" of the system as eight years (or ten years in one of its calculations) was a disputed fact, since McAUTO's testimony fixed the reasonable expectation of use of MSA's system as from three to five years, an estimate receiving confirmation in the refusal of the lessees to go beyond five years in their leases. A summary exhibit such as Exhibit 19, based, as it was, on incorrect premises—especially as vital as the errors in this case—should not have been admitted. By admitting the exhibit with its erroneous assumptions which went to the heart of the issue of damages, the district judge was in effect ruling that "financing charges" were not to be excluded in calculating the royalties or that, if such charges were to be excluded they were to be calculated on a theoretical "real rate of interest," a rate which is supposed to be static but in MSA's case was purely a matter of guess work, and a rate never used in calculations such as that involved here. He also gave the judicial nod to MSA's assumed figure of 96 months (or 120 months in his second calculation) as the proper period over which McAUTO was obligated to pay royalty even though McAUTO was not collecting any payments from the lessee beyond the actual term of the lease, i.e., for sixty months.

Serious as the error in the admission of the exhibit with its obvious misconstruction of the provisions of the Agreement on the payment of royalties was, that error was increased by the instructions, or rather the lack of instructions, given on the royalty claim. Though the district court broke the dispositive issues in the royalty claim into two questions, one of these was not in reality a disputed issue: McAUTO conceded an additional liability of $2,274.06, represented by interest in delayed payments. But the crucial issues—the one that allowed MSA to recover a quarter of a million dollars—were questions of contract construction governing the amount of the royalties: 1. Was MSA entitled to royalties on "fees" not paid by the lessee for years after the lease had expired? 2. Were "financing charges" to be included under the lease in calculating royalties? and 3. Was MSA's so-called "real rate of interest" the proper rate of interest to be used, when calculating "financing charges," if those charges were to be excluded? In his instruction on MSA's claim, the trial judge said that "the plaintiff says and contends that it has offered evidence from which you should be satisfied that it has sustained damages of $284,625.14, as shown on its Exhibit 19, the pros and cons of which have been testified to by the witnesses and debated by the lawyers at some length." In short, he submitted the plaintiff's case on the basis of the exhibit, the correctness of whose legal assumptions it never discerned but left to be resolved largely on the debates of counsel. Thus, the exhibit became the centerpiece in the jury's consideration under the judge's instructions. Moreover, the instructions on McAUTO's contention were merely "that the contract plainly allows the royalty payments to be discounted to their present value, and that when this is done, it has shown that the defendant owed no royalty

payments at all, or that, in any event, the amount owed is some modest sum...." Nowhere did it indicate that McAUTO claimed that the term "paid-up license fee" denoted simply the full period that the lessee was to pay a license fee for calculating in advance the royalty to be paid under that lease by McAUTO. Nor for that matter did it make any reference that even under MSA's construction there was a question to be resolved as to what was the reasonably expected life of the system. The court did not even tell the jury that "financing charges" were to be excluded in any calculation of the royalty payments; it simply stated that this was the "contention" of McAUTO, suggesting that such contention was one open for their determination.

Beyond question, whether the sum on which the royalty was to be paid was to exclude "financing charges" was not a matter to be resolved by the jury. That was a question which the district judge should have resolved under the contract as a matter of law. In addition, he should have ruled on the period of time over which the lease "fee" should be grossed in establishing the sum on which the royalty was to be calculated. Again, as he had ruled on McAUTO's repeated objection to the Exhibit 19, which made assumptions on both of these legal issues, he apparently seemed to accept MSA's inaccurate construction of the Agreement on all of these points.

It may be said that McAUTO did not object to these instructions. It would, however, have been futile to object after the district judge had overruled twice McAUTO's objection to the admissibility of the exhibit on those very grounds. Beyond that, "[t]he court must instruct the jury properly on the controlling issues in the case even though there has been no request for an instruction or the instructions are defective." 9 Wright & Miller, Federal *Practice and Procedure,* § 2556, pp. 654–55 (1977 ed.). Instructions such as those in

this case, which make no comment—in fact, do not even identify—the crucial issues in the claim "heighten the risk [of confusing the jury], given a jury's normal impulse to suppose that the very submission of such a[n exhibit] without comment on the evidence [or the assumptions of law which it is based] must imply some judicial assessment of probable merit." *Colonial Lincoln, Inc. v. Musgrave,* 749 F.2d 1092, n. 3 (4th Cir., 1984). Accordingly, even if there had been a failure of McAUTO to object to the instructions and such failure were not excused by the district judge's prior rulings, the absence of any real instruction on the issues on the royalty claim would constitute "fundamental error" requiring reversal.[23]

The circumstances under which "fundamental error" in jury instructions will justify reversal were properly declared in *Frederic P. Weidersum Associates v. National Home Construction Corp.,* 540 F.2d 62, 66 (2d Cir.1976), where the court said:

"This court has recognized that consideration of alleged errors in a jury charge may be appropriate even absent objection where 'necessary to correct a fundamental error or to prevent a miscarriage of justice'.... Certainly it is 'fundamental' error to give instructions which are hopelessly confusing and which fail 'to provide even the barest legal guideposts to aid the jury in rationally reaching a decision.'"

We in general approved this statement of the rule in our own opinion in *Miller v. Premier Corp.,* 608 F.2d 973, 983 (4th Cir. 1979). *See also, New York Central R. Co. v. Johnson,* 279 U.S. 310, 318–319, 49 S.Ct. 300, 303–304, 73 L.Ed. 706 (1928); *Modave v. Long Island Jewish Medical Center,* 501 F.2d 1065, 1072 (2nd Cir.1974). The instructions on the royalty issue did not give any guidance on what, under the Agreement, determined MSA's right to royalties; it even left it to the jury to determine whether "financing charges" were to be

---

**23.** The point of "fundamental error" has been recently discussed by Judge Phillips of this Court in his article, *The Appellate Review Function: Scope of Review,* 47 Law & Contemp. Probs. 1, 8–9 (1984).

excluded in the calculation of royalties when the Agreement was specific and express on the point. We, however, rest our conclusion of reversal primarily on the error in the admission of the exhibit which resulted in the error in instructions.

Without laboring the point further, we are of the opinion that the matter of what additional royalties, if any, which may be due MSA by McAUTO, must be retried under rulings which will properly restrict the proof and issues and will not include any exhibits which do not conform to the legal rights of the parties under the contract or the evidence. Reversal of the judgment in this regard is ordered and the cause is remanded for further proceedings in accordance with this opinion.

We now address two of the counterclaims of McAUTO, which in our opinion were improperly withdrawn from jury resolution by the district judge at the conclusion of the evidence. The first of these sought damages for failure of MSA to deliver, as agreed, certain essential parts of the system purchased of MSA by McAUTO under the Purchase Agreement. In support of this claim, McAUTO offered proof that there were certain additional parts of the system, as identified in the Exhibit attached to and made a part of the Purchase Agreement, which MSA did not deliver at the time prescribed in the Purchase Agreement. MSA does not dispute its failure to deliver these parts, without which the system was apparently not usable. It would offer initially as an excuse that the system was, as it contends, purchased "as is" and thus did not include the omitted items. It purports to ground this excuse on the "as is" language in the Bill of Sale it furnished McAUTO. In advancing this argument it concedes that the Purchase Agreement with its Exhibit is specific that the omitted parts were an integral part of the system sold by it to McAUTO which was to be furnished McAUTO with the effectiveness of the Agreement. Further,

it would disregard the acknowledgement in the Bill of Sale that the sale recorded thereby was subject to the representations and warranties "expressly stated herein or in the Purchase Agreement," an acknowledgement which was reinforced by the attachment as a part of the Bill of Sale of the Exhibit attached to the Purchase Agreement identifying the specific equipment sold by MSA to McAUTO, which identification covered the very equipment or parts not delivered by MSA as required under both the Purchase Agreement and the Bill of Sale. It would seem under this proof viewed most favorably to the position of McAUTO as we must, that the failure of MSA to deliver all the equipment listed in the Exhibit (made a part of the Purchase Agreement) was a plain breach of MSA's obligation under its contract.

MSA's second defense to this claim of breach is the absence of notice of breach by McAUTO. It is generally said that notice of breach was not an element of a breach of contract action at common law since the buyer's acceptance of title to the goods in most instances extinguished the seller's responsibilities with respect to the goods. *See* 3 Williston on *Contracts*, § 714 (rev. ed. 1961). However, in section 49 of the Uniform Sales Act (1949),[24] the drafters sought to moderate the "harshness of the common law for the buyer by providing that, absent an express contrary agreement, acceptance of the goods by the buyer did not discharge the seller from liability for breach of his promise or warranty." Note, *Notice of Breach and the Uniform Commercial Code*, 25 U.Fla.L.Rev. 520, 521 (1973). Even before this, there had been a definite movement both in the texts and in decisional law away from the common law principle and to a more liberal rule in this context. For instance, in *Robberson Steel Co. v. Harrell*, 177 F.2d 12, 16 (10th Cir.1949), the court, citing some fourteen recent cases in support, said that "acceptance [by the buyer] standing alone and without more does not constitute an effec-

---

**24.** The section provides that "[i]f, after acceptance of the goods, the buyer fail (sic) to give notice to the seller of the breach of any promise or warranty within a reasonable time after the buyer knows, or ought to know of such breach, the seller shall not be liable therefor."

tive waiver of the right of action for damages caused by the breach." *See also,* Corbin on *Contracts,* § 1245 at 580 (1951 ed.):

> "If the seller of goods tenders a defective delivery, defective in either quantity or quality or time, the buyer's receipt of the goods so tendered does not in itself operate as a discharge of his right to the balance of the goods or his right to damages for the seller's breach."

The drafters of the Uniform Commercial Code in section 2–607(3)(a) followed in large part the language of the earlier section 49 of the Uniform Sales Act.[25] However, they were disturbed by the strictness adopted by some courts in their requirement of notice of breach on the part of the buyer under the Uniform Sales Act. For that reason, they added an Official Comment (Comment No. 4) "aimed at remedying a rule adopted under section 49 of the Uniform Sales Act by some courts that a mere complaint of a breach was not adequate notice." *Eastern Air Lines, Inc. v. McDonnell Douglas Corp.,* 532 F.2d 957, 976 (5th Cir.1976) (footnote omitted). This Official Comment was in part:

> "The content of the notification need merely be sufficient to let the seller know that the transaction is still troublesome and must be watched. There is no reason to require that the notification which saves the buyer's rights under this section must include a clear statement of all the objections that will be relied on by the buyer, as under the section covering statements of defect upon rejection (Section 2–605). Nor is there reason for requiring the notification to be a claim for damages or of any threatened litigation

or other resort to a remedy. The notification which saves the buyer's rights under this Article need only be such as informs the seller that the transaction is claimed to involve a breach, and thus opens the way for normal settlement through negotiation."

Under this Official Comment, it is plain that the Code drafters intended by their construction of the notice-of-breach requirement to protect the seller against unfair surprise but to demand no more of the buyer than that he should reasonably notify the seller that he considered the seller to be in breach in failing to meet his obligation under the contract either in the quantity, quality, or time of delivery of the goods sold. Such was the policy which the drafters sought to achieve by the section.

Notwithstanding the obvious purpose of the drafters to eliminate the practice of some courts of holding that "a mere complaint of a breach [made seasonably] was not adequate notice," there are decisions which continue to follow the rule that notice of intent to sue, and not "mere complaint of a breach" is demanded by the section. Typical of these is *K & M Joint Venture v. Smith Int'l, Inc.,* 669 F.2d 1106 (6th Cir.1982), decided under California law.[26] For a contrary view, see *Wilson v. Marquette Electronics, Inc.,* 630 F.2d 575, 583–84 (8th Cir.1980) (applying Arkansas law), and *Kirby v. Chrysler Corp.,* 554 F.Supp. 743, 752 (D.Md.1982) (applying Maryland law). In this case, however, we are governed by North Carolina law in the construction of section 2–607(3)(a). In *Maybank v. S.S. Kresge Co.,* 302 N.C. 129, 273 S.E.2d 681 (1981), the Supreme Court

---

**25.** Section 2–607(3)(a) is to the effect that "the buyer must within a reasonable time after he discovers or should have discovered any breach notify the seller of the breach or be barred from any remedy."

**26.** For a critical discussion of this case, see Note, *Section 2–607(3)(a): Effective Notification of Breach Under the Uniform Commercial Code,* 44 U.Pitt.L.Rev. 733 (1983). The author in that Note said:

> "In *K & M Joint Venture v. Smith Int'l, Inc.,* the Court of Appeals for the Sixth Circuit adopted such a technical interpretation of 2–607(3)(a) [i.e., 'a literal reading of section 2–607(3)(a) may lead to injustice and result in a technical circumvention of the very purposes of this section and the aims of the Code as a whole']. It permitted the pendulum to swing too far toward protection of the seller in derogation of the purposes of the notice requirement.
> *Id.* at 733 (footnote omitted).

of North Carolina aligned itself with the liberal interpretation of the section.

In *Maybank*, the court began by holding that "[i]f plaintiff's evidence shows that the policies behind the requirement have not been frustrated and, instead, have been fulfilled, the evidence is sufficient to withstand a directed verdict motion." 302 N.C. at 134, 273 S.E.2d at 684. It then stated "the policies behind the requirement" of notice as it perceived them. The most important of these policy considerations was "enabling the seller to make efforts to cure the breach by making adjustments or replacements in order to minimize the buyer's damages and the seller's liability"; another was "to afford the seller a reasonable opportunity to learn the facts so that he may adequately prepare for negotiation and defend himself in a suit"; and finally, "the least compelling policy" is "to provide a seller with a terminal point in time for liability." 302 N.C. at 135, 273 S.E. at 684.

There can be no question that McAUTO brought to the attention of MSA the latter's failure to deliver what it had promised at the time it promised to deliver it. The Agreement, with its exhibit, demonstrated this beyond doubt. Nor is there any question but that McAUTO did continuously demand of MSA performance as agreed and left MSA in no doubt that it regarded MSA in breach of the Agreement. McAUTO, by its repeated complaints and demands for compliance by MSA with the Agreement, gave MSA every opportunity "to minimize the buyer's damages and the seller's liability" and "to learn the facts so that ... [it could] defend [itself] in a suit." Under those circumstances, the question of whether adequate notice of breach was given by McAUTO was one for the jury under the rule enunciated in *Maybank*. Just as the court said in *Eastern Air Lines*, "the issue of notice under UCC § 2–607 should have been submitted to the jury with in-structions that it determine whether [McAUTO's] conduct throughout [the delay] constituted adequate and timely notice to [MSA] that it was considered to be in breach of the contract." 532 F.2d at 979–80.

█ Finally, MSA offers as a basis for dismissing the claim that, assuming a breach and adequate notice of breach under 2–607, McAUTO proved only a right to nominal damages. It argues that nominal damages is not a basis for recovery for a breach of contract. North Carolina law, which is controlling on this point,[27] is, however, to the contrary. In *Cole v. Sorie*, 41 N.C.App. 485, 255 S.E.2d 271, 274–75 (1979), the court, citing a long line of North Carolina cases, said:

> "The principle that the violation of a legal right entitles a party to at least nominal damages has been applied to establish that '[i]n a suit for damages for breach of contract, proof of the breach would entitle the plaintiff to nominal damages at least.' ... We hold that plaintiff's evidence of breach of the construction contract was sufficient to go to the jury despite the fact that no damages were shown. The evidence established a prima facie case of breach of contract entitling defendant to at least nominal damages."

Beyond this, McAUTO offered proof of actual damages. It was forced by MSA's delays to attempt at considerable expense to modify or to add to the system MSA had delivered so as to render such system operative. It also suffered losses in sales and/or leases in being delayed entry into a market that would have been immediately available to it had the system been furnished at the time provided in the Purchase Agreement.[28] These claims of damages were matters for jury consideration.

---

**27.** *See, Saval v. BL, Ltd.*, 710 F.2d 1027, 1033 (4th Cir.1983); *Hill v. Nelson*, 676 F.2d 1371, 1374 (11th Cir.1982),

In *Hill* the court said:

"A determination of damages constitutes a substantive issue that turns upon state law."

**28.** In the computer field, market timing is said to be of great value since the market product often has a short life and may be quickly replaced by an improved model.

It follows that the district court erred in failing to submit to the jury McAUTO's counterclaim for damages due to MSA's breach of contract in failing to deliver as agreed all the equipment set forth in the exhibit attached to and made a part of the Purchase Agreement between the parties.

█ McAUTO's second counterclaim on which we find error in granting a directed verdict for MSA was based on the claim that MSA had breached its full disclosure warranty, Article VII, § 6 of the Purchase Agreement, by failing to inform McAUTO that its system was not "integrated," i.e., able to interchange programs and run as a single system. McAUTO representatives learned in precontract negotiations that MSA's software was maintained in 17 different hospital locations, and claim to have asked whether software from different locations could be combined as a single system. MSA officers, allegedly, told them that it could, and the system later had to be redesigned when that representation proved false. Furthermore, McAUTO allegedly found that it took twice as much time to develop "print modules," which cause billing formats to be generated, as MSA represented. McAUTO provided evidence of the additional costs incurred thereby. MSA contends that the facts disprove McAUTO's claims, in that the software *could* be integrated, though at considerable expense, and that the increased time to create the print modules might simply be due to McAUTO's inefficiency. Once again, these were questions of fact, and should have been resolved by the jury. However, the district judge denied this claim on "preponderance of the evidence" grounds. We reverse and remand for retrial of this issue.

To summarize our conclusions: We (1) reverse the judgment of $256,500 granted MSA against McAUTO on the former's claim for "additional payments" of royalties under the Purchase Agreement, (2) reverse the judgments entered on motions for directed verdict in favor of MSA on the two counterclaims of McAUTO, one for failure to deliver as agreed certain essential parts of the system purchased, and the other for breach of full disclosure warranty, and (3) remand the cause to the district court for retrial of the issues in the royalty claim of MSA and the two counterclaims asserted by McAUTO. As we have said, we affirm the dismissal of the other counterclaims of McAUTO and sustain the jury's verdict in the declaratory judgment action.

AFFIRMED IN PART, REVERSED IN PART, AND REMANDED.