Alvin J. SHAPIRO and Jeanne K. Shapiro, as Joint Tenants on behalf of themselves and all others similarly situated and derivatively on behalf of Midwest Rubber Reclaiming Company, Appellants,

v.

MIDWEST RUBBER RECLAIMING COMPANY, Midcon Industries, Inc., f/k/a Goodrich Realty & Development Group, Inc., Carl H. Totsch, Richard M. Cohen, Morris Weissman, Michael Miller and Stanley Kreitman, Appellees.

No. 79–1424.

United States Court of Appeals, Eighth Circuit.

Submitted Dec. 4, 1979.

Decided July 25, 1980.

Jack L. Block, Sachnoff, Schrager, Jones, Weaver & Rubenstein, Chicago, Ill., argued, for appellants; Lowell E. Sachnoff, Chicago, Ill., and John L. Davidson, Jr., Greenfield, Davidson, Mandelstamm & Voorhees, St. Louis, Mo., on brief.

Thomas L. Croft, Coburn, Croft, Shepherd & Putzell, and Michael A. Fisher, Guilfoil, Symington, Petzall & Shoemake, St. Louis, Mo., argued, for appellees; Jim J. Shoemake and Michael A. Fisher, St. Louis, Mo., on brief for Midwest Rubber Reclaiming Co.

Thomas L. Croft and Kenneth W. Bean, St. Louis, Mo., on brief for Midcon Industries et al.

Before HEANEY, BRIGHT and ROSS, Circuit Judges.

BRIGHT, Circuit Judge.

Alvin J. Shapiro and Jeanne K. Shapiro, former shareholders of Midwest Rubber Reclaiming Company (Midwest), brought this action against Midwest, Midcon Industries, Inc. (Midcon), and certain of their officers and directors, alleging numerous violations of the federal securities statutes and state and common law. Having already dismissed several of these claims, the district court[1] granted summary judgment as to the remainder on May 2, 1979, holding that the Shapiros had suffered no damages as a result of the defendants' alleged unlawful activities. *Shapiro v. Midwest Rubber Reclaiming Co.*, 470 F.Supp. 173 (E.D.Mo. 1979). The Shapiros now appeal from this judgment and the district court's partial denial of their requested class certification. For the reasons set forth below, we affirm.

I. *Background.*

Midwest is a Delaware corporation with its principal place of business in East St. Louis, Illinois. The Shapiros became Midwest shareholders in 1973, when Midwest stock was listed and traded on the American Stock Exchange. In January and February of that year, Alvin Shapiro purchased 500 shares of Midwest common stock at an average price of $12.656 per share. In December of 1973, the Shapiros jointly purchased 300 more shares of Midwest common stock at an average purchase price of $9.387 per share.

In April of 1974, Midcon, then known as Goodrich Realty and Development Group, Inc., began acquiring Midwest common stock. Between April 9 and September 30, 1974, Midcon acquired 226,076 shares or 51.72 percent of the outstanding common stock of Midwest. Midcon purchased 220,776 of these shares in private transactions for $15 per share. It acquired the remaining 5,300 shares in the open market, at prices ranging from $12.125 to $13 per share.

Of the shares that Midcon acquired in private transactions, 49,393 were purchased from two Midwest directors, Basil Georges and Ernest Lorch.[2] Another 22,900 shares were purchased from Computer Graphics, Inc., a company in which another Midwest director, J. Baxter Brinkman, had a 25 percent stock ownership interest.[3] Georges and Brinkman resigned as directors shortly after selling their stock; Lorch waited some two months to resign. Midcon paid a premium for these shares of $1.25 to $2.75 over the then-prevailing market price. Midcon also paid a premium on other privately purchased shares, ranging from $1.25 to $7.625 per share over the market price.

At the April 16, 1974, meeting of the Midwest Board of Directors, appellees Richard Cohen and Morris Weissman were elected to fill the vacancies created by the resignations of Mr. Brinkman and Mr. Georges. On June 3, 1974, appellee Michael Miller was elected by the board to serve as a director for the unexpired term of Spencer Murchison, who had resigned. On November 25, 1974, the Midwest Board of Directors unanimously approved an amendment to the corporate bylaws which reduced from nine to seven the number of directors of Midwest.

In September of 1974, the Midwest Board of Directors approved a plan to offer Midwest's minority shareholders the opportunity to exchange their common stock for a $12 principal amount subordinated debenture bearing interest at the rate of 12 percent per year. The purpose of this ex-

1. The Honorable James H. Meredith, United States Senior District Judge for the Eastern District of Missouri.

2. Basil Georges was originally joined as a defendant in this action, but on October 3, 1977, the Shapiros voluntarily dismissed their claims against him. Ernest Lorch has never been named as a defendant.

3. The Shapiros originally named J. Baxter Brinkman as a defendant, but he has since been dismissed.

change offer was to increase Midcon's proportionate ownership of Midwest common stock to 80 percent or more, thus enabling Midcon and Midwest to file consolidated federal income tax returns.

On February 7, 1975, Midwest mailed a proxy statement to all of its common shareholders announcing the annual meeting scheduled for February 24, 1975. The proxy statement disclosed how Midcon had gained control of Midwest and the details of the proposed exchange offer. The Shapiros allege, however, that the proxy statement was false and misleading, in violation of section 14(a) of the Securities Exchange Act of 1934 (1934 Act), 15 U.S.C. § 78n(a) (1976), in that it failed to disclose that (a) Midcon had consented to Midwest's entering into employment contracts with its officers on May 1, 1974; and (b) the object of the exchange offer was to permit Midcon to take advantage of certain tax benefits. At the February 24, 1975, Midwest shareholder meeting, four of Midcon's nominees were elected to the seven-man board of directors, giving Midcon formal control of that board.

On March 20, 1975, Midwest mailed to its shareholders an offering circular describing the subordinated debenture exchange offer. The subordinated debentures offered to the minority shareholders were later appraised to have had a fair market value as of the date of the exchange offer of $9.24 apiece. The closing price of Midwest's common stock on the American Stock Exchange on May 19, 1975, however, was $7.375 per share.[4]

The Shapiros allege that the offering circular sent to Midwest shareholders on March 20, 1975, contained untrue statements and omissions of material facts.[5] More specifically, they allege that the circular falsely stated that participation in the exchange offer was "completely voluntary," when the alternative was to retain holdings in a delisted and subservient corporation. They allege in addition that the circular failed to obtain an opinion of counsel or an independent appraisal as to the fairness of the transaction. Nor did it disclose that the debentures were to be traded at a substantial discount. Finally, the circular failed to set forth a legitimate business purpose and failed to disclose Midcon's commitment to pursue a subsequent cash tender offer if it did not receive at least 80 percent of Midwest's common stock. The appellees argue that, to the contrary, the offering circular disclosed all of the relevant information about the exchange offer.

This exchange offer, after one extension, terminated on May 30, 1975. Approximately 127,000 shares of Midwest common stock were exchanged during this period, increasing Midcon's ownership interest in Midwest's common stock to approximately 73 percent. The Shapiros did not tender their shares pursuant to this exchange offer.[6]

On November 13, 1975, in an effort to increase Midcon's ownership interest to the 80 percent required for filing consolidated federal income tax returns, the Midwest Board of Directors approved a cash tender

---

**4.** The Shapiros contend that the true value of the debentures is reflected in the market price for Midwest common stock at the time the exchange offer was outstanding. Appellees respond that the contingent nature of the exchange offer destroys any assumption of equivalent value. Appellees suggest further that the difference in value between the debentures and Midwest common stock reflects a premium roughly equivalent to that received by the former Midwest directors who sold out privately to Midcon.

**5.** These misstatements and omissions, it is alleged, violated § 14(e) of the 1934 Act (as amended), 15 U.S.C. § 78n(e) (1976). In addition, the Shapiros have asserted as a derivative claim that the offering circular violated the

antifraud provisions of the securities laws, i. e., § 17(a) of the Securities Act of 1933, 15 U.S.C. § 77q(a) (1976), § 10(b) of the 1934 Act, 15 U.S.C. § 78j(b), and the rules promulgated thereunder.

**6.** Because the Shapiros were neither buyers nor sellers, the district court on August 31, 1976, dismissed their individual and class claims alleging violations of § 17(a) of the Securities Act of 1933 and § 10(b) of the 1934 Act. See Greater Iowa Corp. v. McLendon, 378 F.2d 783, 789 (8th Cir. 1967); Blue Chip Stamps v. Manor Drug Stores, 421 U.S. 723, 95 S.Ct. 1917, 44 L.Ed.2d 539 (1975). Although the Shapiros noted this order for appeal, they do not challenge it in their brief. Accordingly, we consider the issue abandoned on appeal.

offer whereby Midwest would offer to repurchase 30,000 shares of its outstanding common stock at $9.25 per share. Midwest made its tender offer in December 1975, and approximately 36,000 shares were tendered in response. As a result of this tender, Midcon's proportionate ownership of outstanding Midwest common stock rose to approximately 82 percent. The Shapiros did not participate in the cash tender offer, and they do not challenge it here.

In fiscal 1976 and 1977, Midcon and Midwest filed consolidated federal income tax returns, which resulted in tax savings to both firms. In late 1977, the Midwest Board of Directors approved a merger between Midwest and Newco, Inc., a wholly owned subsidiary of Midcon. The proposed merger called for the surrender of all outstanding Midwest common stock in exchange for a $45 principal amount subordinated debenture, bearing interest at the rate of 10 percent and due in 1998. On February 20, 1978, Midwest mailed to all of its outstanding common shareholders a proxy statement together with a cover letter setting forth the terms of the proposed merger and announcing that the proposal would be voted upon at the annual shareholders' meeting. The proxy statement noted that the $45 subordinated debentures to be exchanged in the proposed merger had been appraised at approximately $40 apiece. The merger was approved at the shareholders' meeting on March 15, 1978, and the Shapiros thereafter exchanged or became entitled to exchange their common stock for the subordinated debentures. The Shapiros have not challenged this merger. Having invested $9,144.10 in Midwest common stock in 1973, they now hold debentures with a face value of $36,000.

The Shapiros filed this action on June 24, 1975, in the Northern District of Illinois. Their complaint charged the appellees with having violated the law by devising a stock exchange scheme to appropriate the assets of Midwest, causing economic detriment to Midwest's minority shareholders. On October 17, 1975, the action was transferred to the Eastern District of Missouri. The Shapiros thereafter twice amended their complaint in response to district court rulings. The first amended complaint asserted a number of claims derivatively on behalf of Midwest,[7] and the second omitted pendent state law claims.[8] The Shapiros' second amended complaint requested several forms of relief, but according to their appellate brief, the Shapiros principally seek monetary damages equal to the difference between the $15 per share paid privately by Midcon and $7.375, the market price for Midwest stock at the time of the exchange offer.

On June 8, 1978, the district court partially granted the Shapiros' motion for class certification. The district court certified a class to consist of all persons who owned shares of Midwest common stock on March 20, 1975, and who did not sell or exchange their stock during the period that the March 20, 1975, exchange offer was outstanding. The district court later amended its order to exclude also those shareholders who did not sell their stock pursuant to the December 8, 1975, cash tender offer. On February 1, 1979, the appellees filed a joint motion for summary judgment, arguing, among other things, that by virtue of the March 15, 1978, merger, the Shapiros suffered no damages due to the alleged unlaw-

---

7. The district court interpreted the Shapiros' initial complaint as alleging derivatively only state and common law violations of fiduciary duty. In their first amended complaint, the Shapiros added derivative allegations that the appellees' conduct violated both the antifraud provisions of the federal securities laws, *see* note 5 *supra*, and § 13(d) of the 1934 Act, 15 U.S.C. § 78m(d) (1976), which required Midcon to file certain information with the SEC when it purchased Midwest stock.

8. In an order dated September 27, 1977, the district court declined to exercise pendent jurisdiction in this case, and accordingly it dismissed the Shapiros' state law claims without prejudice. On October 18, 1977, the Shapiros filed their second amended complaint, alleging violations solely of the federal securities laws. At the same time, the Shapiros filed suit in the Circuit Court for the City of St. Louis, asserting class and derivative claims against the appellees for alleged violations of state and common law duties.

ful activities of Midcon and the other appellees in 1975. The district court granted this motion on May 2, 1979.

In its memorandum opinion, the district court reasoned that the Shapiros were, in the end, sellers of securities, whose damages were to be measured by the difference between the fair market value of their shares when sold and the amount actually received. *Shapiro v. Midwest Rubber Reclaiming Co., supra,* 470 F.Supp. at 178. Because the Shapiros were to receive a subordinated debenture worth $40 for each share of their stock, while they claimed that their shares were "worth" only $15, the court held that they could establish no damages. The court distinguished *Harris v. American Investment Co.,* 523 F.2d 220 (8th Cir. 1975), *cert. denied,* 423 U.S. 1054, 96 S.Ct. 784, 46 L.Ed.2d 643 (1976), as applicable only to buyers of securities. The court also dismissed the Shapiros' derivative claims because, it found, "no damages can be shown to the corporation." *Shapiro v. Midwest Rubber Reclaiming Co., supra,* 470 F.Supp. at 179. The Shapiros do not challenge this finding on appeal.[9] Thus, only the individual and class action claims remain for our consideration.

## II. *Analysis.*

### A. *The Issue of Damages.*

The Shapiros argue strenuously that the district court mischaracterized them as "sellers" and that, in any event, the rule in *Harris v. American Investment Co., supra,* applies to buyers and sellers alike. We agree that, in an appropriate case, a defrauded seller may claim damages under the *Harris* doctrine. Nonetheless, we hold in this case that *Harris* is not relevant to the Shapiros' asserted damages.

In *Harris, supra,* the plaintiff had purchased shares in a corporation at a time when, he alleged, the filing of false and misleading information had artificially inflated the market price. The district court found that Harris had suffered no damages, because he could have recovered his investment by selling either just after he had made his investment, or after filing his lawsuit. This court reversed, holding that Harris could show damages either by proving that the actual value of his securities on the date of purchase was less then what he paid for them, or by comparing the latter sum with the market value of the securities after the fraud was publicly discovered. *Harris v. American Investment Co., supra,* 523 F.2d at 227. This court also held that a defrauded buyer of securities may maintain an action for damages, even though he continues to hold the securities. The court noted that such a buyer has, in effect, made a second investment decision at the time he discovers the fraud, one unrelated to his initial decision to purchase the stock. Damages for fraud in the initial transaction are not affected by events after this second decision. *Id.* at 228.

■ These damage rules are equally applicable to a defrauded seller. Such a person may prove his damages by the difference between the fair market value of his securities when sold and the amount actually received, as noted in *Ehrler v. Kellwood Co.,* 391 F.Supp. 927, 930 (E.D.Mo.), *aff'd on other grounds,* 521 F.2d 1347 (8th Cir. 1975). If the "fair" market value of the securities when sold is unascertainable because of the widespread impact of false and misleading information, then the seller may employ either of the methods of proof outlined in *Harris* to establish his damages.

This court has specifically applied the "second investment decision" rule of *Harris* to the damage claims of plaintiffs who were both buyers and sellers. In *Nye v. Blyth Eastman Dillon & Co., Inc.,* 588 F.2d 1189

---

**9.** To be sure, in their reply brief the Shapiros suggest that their arguments regarding damages apply to the district court's dismissal of their derivative as well as their class action allegations. The district court made separate findings with respect to these claims, however, and the Shapiros' arguments are restricted to the proper measure of damages for holders of securities. The Shapiros do not suggest that the district court's finding of no harm to Midwest was clearly erroneous, and indeed the record before us would not support such an argument.

(8th Cir. 1978), the plaintiffs proved that their broker had made unauthorized purchases and sales of securities. In a number of instances, however, the plaintiffs had in effect ratified the broker's actions. This court held that the plaintiffs' damages did not extend beyond the period in which they relied on the broker's misrepresentations, plus a reasonable time thereafter that would allow them to take corrective action by selling or repurchasing the securities in question. *Id.* at 1198–1200.

The Shapiros derive from these cases the rule that damages for securities fraud are fixed at the time that the fraud is committed or discovered, and that after-fraud events (such as a subsequent merger) are irrelevant. This is true enough in a securities fraud case, but such is not really the nature of the Shapiros' claim.

▮▮▮▮ The rule in *Harris* and its progeny is based upon the proposition that damages for securities fraud are determined in accordance with the extent to which false and misleading information actually harmed the complaining party, either directly (through actual reliance) or indirectly (by affecting the market upon which the party traded). *See Vervaecke v. Chiles, Heider & Co., Inc.,* 578 F.2d 713, 715–16 (8th Cir. 1978). In this case, the Shapiros neither relied nor traded, and so they were never harmed as a result.[10] They cannot claim the benefit of the "second investment decision" rule because

they made no initial investment decision upon which liability or damages can be predicated. Because they were never adversely affected by the fraudulent conduct of which they complain, the Shapiros cannot claim the rule in *Harris* as a basis for showing damages to themselves or other members of their class.

This conclusion does not end our inquiry, of course. We must examine the pleadings in this case to determine if there is some other theory under which the Shapiros might recover damages. That is to say, we must examine the grounds asserted for individual and class relief: alleged violations of the proxy and tender offer provisions of the 1934 Act, 15 U.S.C. § 78n(a) and (e) (1976).[11]

The Shapiros allege that material omissions as well as false and misleading information infected the 1975 proxy statement and exchange offer, both of which contributed materially to Midcon's takeover of Midwest.[12] The Shapiros no longer claim that this takeover harmed Midwest; rather, they argue simply that they should receive the same price per share for their stock as was paid privately to other Midwest shareholders. In other words, they claim damages premised on some notion of fairness. *Cf. Holt Civic Club v. Tuscaloosa,* 439 U.S. 60, 66, 99 S.Ct. 383, 388, 58 L.Ed.2d 292 (1978) (prayer for relief may be examined to illuminate the substantive theory under which a plaintiff is proceeding).[13]

---

10. The Shapiros allege, however, that false and misleading information in the proxy statement and exchange offer prompted some minority shareholders to sell their stock for less than it was worth. Although these shareholders may well have a claim for damages, the Shapiros and others in their class (as certified) did not act in reliance upon this information and cannot be said to have been harmed by it. It is for this very reason that the district court dismissed their individual and class action antifraud claims. *See* note 6 *supra.* Indeed, if we assume the accuracy of the Shapiros' charges, both Midwest and those of its shareholders who did not participate in the exchange offer but who sold out later may have been financially advantaged by the appellees' fraudulent conduct.

11. We note in passing that there may be some question whether the Shapiros have standing to

advance their claim under 15 U.S.C. § 78n(e) (1976). *Cf. Hundahl v. United Benefit Life Ins. Co.,* 465 F.Supp. 1349, 1369 (N.D.Tex.1979) (denying standing to plaintiffs who clearly did not rely on alleged misrepresentations in the tender offer materials). Nonetheless, the district court did not consider this issue and it is not before us on appeal.

12. For present purposes we assume, as we must, the truthfulness of these allegations. The allegations suggest that the Shapiros may have suffered harm despite their own inaction because the appellees unlawfully induced other minority shareholders to exchange their shares.

13. The Shapiros' complaint also contains suggestions that former Midwest directors acted faithlessly in selling their shares privately to Midcon. Although in some circumstances pre-

■ Undoubtedly, a takeover such as this (assuming that the eventual merger was planned from the outset) raises basis fairness problems in the division of the purchase price among former shareholders. *See* Brudney and Chirelstein, *Fair Shares in Corporate Mergers and Takeovers*, 88 Harv. L.Rev. 297, 330–36 (1974); Brudney and Chirelstein, *A Restatement of Corporate Freezeouts*, 87 Yale L.J. 1354, 1361–62 (1978).[14] Moreover, while fairness claims *per se* are not cognizable under the federal securities laws, *see Sante Fe Industries, Inc. v. Green*, 430 U.S. 462, 97 S.Ct. 1292, 51 L.Ed.2d 480 (1977), a court may inquire into the fairness of the terms of a transaction or a change in corporate structure to determine the appropriate relief for procedural irregularities, such as proxy violations. *See Mills v. Electric Auto-Lite Co.*, 396 U.S. 375, 90 S.Ct. 616, 24 L.Ed.2d 593 (1970).[15]

■ If we assume that the conditions for such an inquiry are met in this case, however, we must focus on the fairness of the entire takeover procedure. Clearly the Shapiros were harmed, if at all, only when the takeover was consummated—*i. e.*, when they were frozen out in 1978. They do not, however, challenge the terms of the freezeout merger or allege that they were harmed by it.[16] Consequently, they cannot show damages due to alleged unfairness.

We conclude that summary judgment in this case was appropriate, because the Shapiros' allegations provide no basis on any legal theory for granting relief to them or the other members of their class, as certified. The Shapiros have simply failed to establish through their pleadings that they were personally harmed by the acts of which they complain. *Cf.* 15 U.S.C. § 78bb(a) (1976) (limiting a person's recovery under the 1934 Act to "his actual damages on account of the act complained of"). We turn now to consider whether the district court correctly excluded from the plaintiff class those Midwest shareholders

---

miums paid to controlling stockholders can be recovered, *see Perlman v. Feldmann*, 219 F.2d 173 (2d Cir.), *cert. denied*, 349 U.S. 952, 75 S.Ct. 880, 99 L.Ed. 1277 (1955), these circumstances are not present here and, in any event, the selling directors are no longer parties defendant in this case.

14. Brudney and Chirelstein analogize the two-step takeover (tender offer or private purchase, followed by merger) to a unitary sale of the firm's assets. Where the firm itself is sold, all stockholders share pro rata in the proceeds; Brudney and Chirelstein argue that the same rule of pro rata distribution should be applied where that result is achieved in successive transactions. That is to say, they would prohibit an acquiring firm from making differential payments to the shareholders of the acquired firm. Brudney and Chirelstein also suggest, however, that payment of a premium for control is less objectionable if the acquiring firm proposes to operate the acquired firm for a substantial period as a partly owned subsidiary, for then it is reasonably likely that the minority shareholders will benefit from the new management. Brudney and Chirelstein, *supra*, 88 Harv.L.Rev. at 332 n.70. (*But see* note 13 *supra*.) In such a case the parent firm assumes a fiduciary duty with respect to these shareholders. *See* note 15 *infra*.

15. In *Mills*, minority Auto-Lite shareholders challenged the 1963 merger of Auto-Lite and Mergenthaler Linotype Co. on the ground that

the Auto-Lite management had failed to disclose material information in the proxy statement soliciting approval for the merger. The Supreme Court held that the shareholders had established a sufficient causal relationship between the omissions in the proxy material and the merger to justify relief. *Id.* at 384–85, 90 S.Ct. at 621–622. The Court indicated that the fairness of the terms of the merger would be a relevant consideration in determining the appropriate relief. *See id.* at 386–89, 90 S.Ct. at 622–624.

On remand, the Seventh Circuit held that the terms of the merger had been fair to the minority shareholders; accordingly, the court denied them any damages. *Mills v. Electric Auto-Lite Co.*, 552 F.2d 1239 (7th Cir.), *cert. denied*, 434 U.S. 922, 98 S.Ct. 398, 54 L.Ed.2d 279 (1977). The court relied upon Brudney and Chirelstein, *supra*, 88 Harv.L.Rev. at 307–25, in analyzing the fairness requirements of the fiduciary duty which a parent corporation owes to minority shareholders of its long-held subsidiary.

16. The fact that the Shapiros eventually received a $45 debenture for each share of their Midwest stock suggests the reasonable inference that they can advance no personal claim of unfair treatment in the takeover process. Those members of the Shapiros' class who sold out before the final merger can likewise claim unfairness only with respect to the prices at which they sold. No such claim is made here.

who earlier exchanged or tendered their shares.

### B. *The Class Certification Claim.*

The Shapiros argue that, regardless of the merits of their individual and class claims, the district court erred in refusing to certify a class of all persons (except the appellees and their families) who owned Midwest common stock on March 20, 1975.[17] The proposed class would have included all those who exchanged their shares for subordinated debentures pursuant to the March 20, 1975, exchange offer, or participated in the subsequent cash tender offer.

▪ Initially, we note that a trial court has broad discretion in determining whether a class action may be maintained, and its determination will not be overturned absent a showing that it abused that discretion. *Wright v. Stone Container Corp.*, 524 F.2d 1058, 1061 (8th Cir. 1975); *Polin v. Conductron Corp.*, 552 F.2d 797, 802 (8th Cir.), *cert. denied*, 434 U.S. 857, 98 S.Ct. 178, 54 L.Ed.2d 129 (1977); *Rule v. Intern. Ass'n of Bridge, Etc., Workers*, 568 F.2d 558, 563 (8th Cir. 1977). This discretion extends to defining the scope of the class. After reviewing the record in this case, we are unpersuaded that the court abused its discretion in refusing to certify the class requested by the Shapiros.

Fed.R.Civ.P. 23(a) sets forth four prerequisites to a class action: 1) numerosity of the class, 2) common questions of law or fact, 3) typicality of the representatives'

claims or defenses, and 4) adequacy of representation. The district court found that, while the Shapiros' proposed class satisified the requirements of numerosity and common questions, the fact that the Shapiros had not exchanged their stock in response to the allegedly unlawful exchange offer rendered their claims atypical and their representation suspect.[18] Accordingly, the court restricted the plaintiff class to those Midwest shareholders who did not exchange their shares in response to the 1975 exchange offer, later amended to exclude also those who did not participate in the later cash tender offer.[19]

As we held above, the Shapiros have failed to establish that they were harmed by any of the acts of which they complain. In *East Texas Motor Freight v. Rodriguez*, 431 U.S. 395, 97 S.Ct. 1891, 52 L.Ed.2d 453 (1977), the Supreme Court held that "a class representative must be part of the class and 'possess the same interest and suffer the same injury' as the class members." *Id.* at 403, 97 S.Ct. at 1896 (citations omitted). In that case, as here, the named plaintiffs "could have suffered no injury as a result of the alleged [unlawful] practices, and they were, therefore, simply not eligible to represent a class of persons who did allegedly suffer injury." *Id.* at 403–04, 97 S.Ct. at 1897. It follows that the district court acted properly in refusing to certify the Shapiros as representatives of a class including participants in the 1975 exchange offer.[20]

Accordingly, we affirm.

---

17. [T]he denial of class certification [is] an example of a procedural ruling, collateral to the merits of a litigation, that is appealable after the entry of final judgment. [*Deposit Guaranty National Bank v. Roper*, 445 U.S. 326, 336, 100 S.Ct. 1166, 1172, 63 L.Ed.2d 427 (1980) (footnote omitted).]

18. The district court relied upon the following language in 3B *Moore's Federal Practice* ¶ 23.-07[3]:

   In order for a party adequately to represent a class or a subclass, his interests must be wholly compatible with and not antagonistic to those whom he would represent. (Footnote omitted.)

19. The district court offered no explanation for this latter restriction, which turns on an event

unchallenged by any party. Although we do not understand how the concerns that underlay the court's initial order required its subsequent amendment, our disposition of the certification issue renders this action of no consequence.

20. Like the Court in *Rodriguez*, we decide this issue upon the record before us. *See id.* at 406 n.12, 97 S.Ct. at 1898 n.12. We do not, however, rely simply on the Shapiros' eventual receipt of $45 subordinated debentures in return for their stock, for it seems to us a necessary implication of *Deposit Guaranty National Bank v. Roper, supra*, and *U.S. Parole Comm'n v. Geraghty*, 445 U.S. 388, 100 S.Ct. 1202, 63 L.Ed.2d 479 (1980), that the issue of proper class certification survives and must be considered apart from receipt of relief by named

plaintiffs. Rather, we have examined the Shapiros' allegations to determine the nature of their interest throughout this litigation in the conduct and transactions they challenge. These allegations disclose no harm to the Shapiros either at the time that they brought this action or thereafter.

Because we find *Rodriguez* dispositive of the issue before us, we need not consider the parties' other arguments regarding the typicality of the Shapiros' claims and the adequacy of their proposed representation.