854 F.2d 1317
Unpublished Disposition
 NOTICE: Fourth Circuit I.O.P. 36.6 states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Fourth Circuit.
William C. STUCKEY, Plaintiff-Appellant,
and
Sam M. Deal, Plaintiff,
v.
John C. GEUPEL, John G. Jenkins, Carl M. Geupel Construction
Company, Inc., an Ohio Corporation, Richard A. Roloff,
Capitol Resources-Lasher, Inc., a Missouri Corporation; K &
P Coal Company, a West Virginia Corporation (a dissolved
corporation), Kanawha Pocahontas Coal Company, a
partnership, George H. Capps, Columbus Lasher Partnership, a
partnership, Defendants-Appellees,
and
James V. Brown, Defendant.
 No. 87-1073.
 United States Court of Appeals, Fourth Circuit.
 Argued Jan. 6, 1988.
Decided Aug. 1, 1988.
 
 Robert Noell Bland for appellants.
 M. Blane Michael (W.T. Shaffer, Gale R. Lea, Jackson, Kelly, Holt & O'Farrell on brief) for appellees.
 Before WIDENER and CHAPMAN, Circuit Judges, and BUTZNER, Senior Circuit Judge.
 CHAPMAN, Circuit Judge:
 
 
 1
 This is an appeal from a judgment notwithstanding the verdict (JNOV) in a securities fraud and RICO action. Plaintiff, a minority shareholder, alleged that defendants breached their fiduciary duty to him in purchasing his interests in a corporation and in mining properties without disclosing to him certain ongoing negotiations between the majority shareholders and partners and a potential purchaser of all of the properties and the corporate stock. A jury awarded actual damages in the amount of $2.1 million. The district court granted defendants' JNOV motion and entered judgment and costs for defendants. Plaintiff Stuckey appeals, and we affirm.
 
 
 2
 * In 1974, four partners, plaintiff Stuckey, Sam Deal, Emory Moore, and Carney King, acquired coal rights in 10,000 acres, being a part of lands known as the Lasher Tract, from Maryland Coal & Coke Company. Those four partners also acquired an option to buy all mineral rights in another 10,000 acres of that tract. The price for the deal, including the price of the optioned land, if exercised, was $1.5 million. Most of the purchase price was borrowed by the partners, particularly Stuckey and Deal.
 
 
 3
 In December 1974 the partners formed the Kanawha and Pochanatas Coal Company, a partnership ("Kanawha" or "the partnership"), for the mining and leasing of the coal in the Lasher Tract. Partnership percentages were as follows: Stuckey, 30%; Deal, 25%; Moore, 25%; and King, 20%. The partnership planned to find others to lease the mineral rights, mine the coal, and pay royalties to the partnership. In the same year, the partners also formed a corporation, K & P Coal Company, and selected Stuckey as its president. K & P Coal was to build and operate a small coal tipple that would service the tract. This tipple was located on land owned by a railroad and was not on the Lasher Tract.
 
 
 4
 During 1975 the partnership had not secured enough leases to pay the September 1975 installment on its debt to Maryland Coal. In July 1975 Stuckey was removed as president of K & P and as managing partner of Kanawha. Defendant Geupel purchased Moore's twenty-five percent interest in the minerals, the partnership, and the corporation, and Geupel became managing partner of Kanawha. Geupel arranged a loan to meet the September 1975 payment due Maryland Coal. He also arranged the building of the tipple. Defendant Jenkins contemporaneously acquired one-half of Geupel's interest and became a partner in the venture.
 
 
 5
 In February 1976 two interested investors from St. Louis, Richard Roloff and George Capps ("the St. Louis partners") met with all members of the Kanawha partnership, including Stuckey and Deal. At this meeting the St. Louis partners proposed a purchase of the Kanawha partners' interest in the Lasher Tract for $2 million cash and $2.50 per ton royalty ("the St. Louis formula"). Stuckey viewed this proposal unfavorably. The St. Louis partners were not deterred, as indicated in a letter of Roloff to Geupel dated May 26, 1976, which stated: "Even now, if you find that Stuckey will not budge, I would like to explore how we might join with you on this program. You are the type of person that we think we could work with and I believe what we have to offer could help make your project a financial success."
 
 
 6
 While these discussions with Roloff were taking place, certain overtures were made by another persepctive buyer, Howard Burris. In mid-April 1976, Sam McClung, as agent for Burris, began negotiations with Geupel looking to the purchase of mining properties. These contacts continued into the summer and early fall of that year. Correspondence between McClung and Burris on April 23, 1976 indicated that the transaction may total $40 million, but no offer of this amount was ever made or communicated to defendants Geupel and Jenkins prior to their purchase of plaintiff's interest on June 5, 1976. In McClung's April 16 letter to Burris, he indicated that the negotiations with Geupel were going to proceed on a "confidential" basis.
 
 
 7
 In March 1976 Geupel and Jenkins bought Deal's twenty-five percent interest in the tract, the Kanawha partnership, and the K & P stock based upon the St. Louis formula (25% X $2 million + $2.50 per ton royalty, or $500,000 + 62.5cents per ton royalty). About the same time they bought King's twenty percent interest. This made Geupel and Jenkins majority partners and shareholders. In May 1976 McClung talked with Stuckey about the purchase of his stock. Although he said he was not interested, on June 5, 1976, Stuckey sold his thirty percent interest to Geupel and Jenkins for $3 million. At this time he had not been informed of the discussions with McClung. The sale included Stuckey's assignment of his entire thirty percent share of the coal interests, partnership interests, and K & P stock. On the date of sale, K & P had a negative net worth.
 
 
 8
 After the purchase of Stuckey's interest, Geupel and Jenkins exercised the option on the additional 10,000 acres. This tract was subject to various leases, most notably 4000-acre coal leases each to Iaeger Mining Company and U.S. Steel Corporation. Burris, who in August 1976 was discussing the purchase of the tract with Geupel, was interested in the operations of Iaeger.
 
 
 9
 On September 10, 1976, Burris wrote Geupel as follows:
 
 
 10
 The bench marks of the offer I expect to make on behalf of my associates and myself is that we would agree to purchase good and marketable fee simple title to the lands (including coal, oil, gas and other minerals) situate in Wyoming and McDowell Counties, known as the Lasher A tract, containing approximately 16,000 acres, and the Lasher B tract, containing approximately 3,700 acres, exclusive of and subject to the present surface and timber rights of Coastal Lumber Company, together with all other real and personal property presently used in connection with the production or marketing of coal from either or both of these tracts, all for the gross purchase price of Seventeen Million Dollars ($17,000,000), payable as follows:
 
 
 11
 (1) Five Million Dollars ($5,000,000) cash at closing.
 
 
 12
 (2) Assumption of existing obligations to persons and in maximum amounts as shown below:
 
 
 13
 Maryland Coal and Coke $ 1,500,000
Sam Deal 500,000
 continuing override 62 1/2 cents
 per ton on production
Carney King 160,000
 240,000
 100,000
 continuing override of 30 cents per ton on production
Bill Stucky [sic] 3,000,000
Emery [sic] Moore 163,000
 ------------
 Total $ 5,663,000
 
 
 14
 with credit for the sum of the unpaid dollar amounts assumed (but with no credit for the amounts of continuing override obligations which accrue after closing).
 
 
 15
 (3) Balance payable out of production at an annual rate of five per cent (5%) of gross sale price of coal produced from the properties, or Five Hundred Thousand Dollars ($500,000), whichever is greater.
 
 
 16
 (4) Any balance remaining unpaid five (5) years after closing would be payable in cash at that time.
 
 
 17
 All of the foregoing is, of course, based upon my present understanding of the information which has been furnished to me with respect to these properties and upon the premise that we can and will come to some agreement respecting disposition of the Dandy suit before closing of the sale and purchase.
 
 
 18
 I am arranging with Sam McClung to hand-deliver this letter in my absence and will appreciate it if you will give him your reaction within the next 10 days in order that he and I may jointly consider the matter promptly upon my return.
 
 
 19
 This offer was unacceptable Geupel and Jenkins. They contend that this offer required them to deliver good and marketable fee simple title and that this would have cost them considerably more than $17 million to buy the leases outstanding and the mining equipment being used on the tract. At about the same time Geupel and Jenkins granted Capps an option to purchase an undivided one-half of their interest in the Lasher Tract. In January 1977 the St. Louis partners acquired one-half of the interests from Geupel and Jenkins in the Lasher Tract, and the Lasher Tract minerals were then leased to another mining company, National Mines, but it was necessary for Geupel, Jenkins, Capps, and Roloff to borrow $7.9 million to buy the lease and equipment of Iaeger Mining that was on the Lasher Tract. Defendants were not aware that National Mines was interested in the Lasher Tract until August 1976.
 
 
 20
 Stuckey brought this action in the Southern District of West Virginia on March 28, 1983. He claimed that defendants Geupel and Jenkins had violated SEC Rule 10b-5, 17 C.F.R. Sec. 240.10b-5 (1987), promulgated pursuant to the Securities Exchange Act of 1934 ("1934 Act"), 15 U.S.C. Sec. 78a et seq. (1982 & Supp. IV 1986), and the Racketeer Influenced and Corrupt Organizations Act (RICO), 18 U.S.C. Sec. 1964 (1982 & Supp. IV 1986), by failing to inform him of the negotiations with Burris prior to the purchase of his interests on June 5, 1976. Stuckey further asserted that defendants failed to advise him that Capps and Roloff were interested in keeping him in the venture.
 
 
 21
 A jury returned a verdict under RICO and the 1934 Act in the amount of $2.1 million. The district court reviewed the evidence and found that Stuckey had failed to prove his damages and granted defendants' JNOV motion. The trial judge, in a lengthy and detailed opinion, found that the plaintiff proved no economic injury as a result of the defendants' failure to disclose the Burris inquiries and negotiations. The court determined that the $3 million Stuckey received from defendants was much more than his share would have been under Burris' $17 million proposal. The court also rejected Stuckey's assertion that the Burris proposal was implicitly subject to all leases. The defendants contended and the district court found that the Burris proposal required the seller to convey "a good and marketable fee simple title" and that this meant free of all leases and encumbrances on the land and the equipment, excepting the rights of Coastal Lumber Company. Plaintiff's RICO claims have been dropped and this appeal involves only the Rule 10b-5 claims.
 
 
 22
 The primary claim of the plaintiff was that the defendants concealed from him the negotiations with Burris, particularly the $17 million offer made by Burris to Geupel in the letter of September 10, 1976. Plaintiff contended that these negotiations were in progress at the time he sold his thirty percent interest in the partnership and the corporation for $3 million on June 5, 1976. The district court found:
 
 
 23
 Significantly, there is no evidence to suggest that either the $40,000,000 figure or the $5,000,000 figure for Stuckey's interest were communicated to the defendants. All they knew as of June 5, 1976, was that Burris was agreeable to an initial cash payment of $5,000,000, plus a royalty. Even so, the jury could reasonably find that a reasonable investor would consider the negotiations respecting $5,000,000 plus a royalty as important in reaching a decision to sell a 30% interest for $3 million. Nevertheless, the question regarding damages remains. Even if the defendants fraudulently failed to disclose material negotiations with Burris, Stuckey may only recover such damages, if any, as he is able to prove.
 
 
 24
 The normal method for determining a seller's damages in a case of fraud is to subtract the amount actually received from his interest's fair market value. See Shapiro v. Midwest Rubber Reclaiming Co., 626 F.2d 63 (8th Cir.), cert. denied, 449 U.S. 1079 (1980); Alley v. Miramon, 614 F.2d 1372 (5th Cir.1980); Oxidental Ins. Co. v. Pat Ryan & Associates, Inc., 496 F.2d 1255 (4th Cir.), cert. denied, 419 U.S. 1023 (1974). Here, the plaintiff contends that the fair market value of his interest may be regarded as equal to thirty per cent of $18,840,000 (i.e., $5,652,000), for which he received $3,000,000. Thus, he calculates his loss profits at $2,652,000 which he asserts would have grown to $6,023,753 in worth by the time of trial. The defendants, on the other hand, argue that the plaintiff received more money in the June 5, 1976, sale than he would have realized had he been paid pursuant to the Burris proposal. [footnote omitted]
 
 
 25
 The figure of $18,840,000 was used by plaintiff's expert witness. The defendants contend that the jury verdict of $2.1 million was obviously the result of the jury taking thirty percent of $17 million ($5.1 million) and reducing this by the $3 million that the plaintiff received in the June 5, 1976 sale. The defendants contend that Stuckey received much more in his acceptance of their $3 million for the sale of his interest than he would have received under the Burris proposal contained in the September 10, 1976 letter, because of the letter's requirement that they convey a "good and marketable fee simple title to the lands (including coal, oil, gas and other minerals) ... subject to the present surface and timber rights of Coastal Lumber Company, together with all other real and personal property presently used in connection with the production or marketing of coal from either or both of these tracts." The defendants contend that it would have cost more than $24 million to comply with the terms of that offer.
 
 
 26
 The court found that although some of the proposed costs the defendants claimed would be necessary to comply with the offer were contested questions of fact, the court found:
 
 
 27
 However, it is not disputed that the listed cost of Iaeger Mining lease and equipment and the mining equipment in the mines are substantially accurate. Inasmuch as these costs alone total $11.4 million, and the plaintiff admits that the partnership had incurred liabilities of $1,500,000, the plaintiff's share for his thirty per cent interest under the Burris proposal would have been far less than the $3 million received by him from his sale of June 5, 1976.
 
 
 28
 The plaintiff argues that in framing the $17 million proposal, Burris did not consider either the Iaeger lease and equipment or the mining equipment then on the Lasher Tract. According to the plaintiff's interpretation, the $17 million price assumed conveyance subject to all existing leases. This interpretation is untenable. The reference to fee simple title with a limited exclusion regarding Coastal Lumber Company compels the conclusion that Burris was proposing to pay $17 million only if he received the property free of encumbrances other than the Coastal Lumber Company lease. Plaintiff would treat the "together with" clause of the letter as being a continuation of the exclusionary language set out with respect to Coastal Lumber's surface and timber rights. A plain reading of the entirety of the paragraph in which that language appears leaves no room for doubt that the clause ("together with all other real and personal property" used in the production of coal) is designed to add to rather than limit the fee simple title to the two Lasher Tracts of real estate designated at the beginning. Indeed, if plaintiff's anomalous interpretation were adopted, the "together with" clause would be rendered useless by reading to exclude personal property, none of which was included in the fee simple real estate title specified at the outset, and by deeming it to exclude "other" real property which likewise by definition was not included at the outset. [footnote omitted]
 
 
 29
 The district court found that the terms of the September 10, 1976 letter were plain and unambiguous and that it did require good and marketable fee simple title to the Lasher Tracts together with all real and personal property used in connection with the production and marketing of coal on the Lasher Tracts and that this included the equipment. The court concluded that there was no competent evidence that the Burris proposal would have netted the plaintiff more than the $3 million he received when he sold to the defendants. The court found that since plaintiff had suffered no economic injury because of the defendants' failure to disclose the Burris inquiries and negotiations, he could not recover and the verdict must be set aside and judgment entered for the defendants.
 
 II
 
 30
 Plaintiff appeals, claiming that the district court erred: (1) in its interpretation of the Burris letter of September 10, 1976, (2) in not charging the jury that plaintiff's interests in the mineral rights and in the partnership were securities under the 1934 Act, (3) in not considering other ways that the jury could have found damages for the plaintiff, (4) in finding no damage to the plaintiff from the Capps and Roloff transaction, and (5) in assessing costs against the plaintiff.
 
 
 31
 Under Federal Rule of Civil Procedure 50(b), a JNOV may be ordered if the moving party made a proper motion for a directed verdict at the close of all of the evidence and if, when considering the evidence and every legitimate inference reasonably to be deduced therefrom in favor of the plaintiff, the jury could not properly find a plaintiff's verdict from such evidence and its inferences, or when as a matter of law the plaintiff failed to make out a case. The JNOV motion is subject to the same standards as the motion for a direct verdict. Wheatley v. Gladden, 660 F.2d 1024 (4th Cir.1981); Ralston Purina Co. v. Edmunds, 241 F.2d 164 (4th Cir.), cert. denied, 353 U.S. 974 (1957). In deciding whether a JNOV motion should have been granted is a question of law requiring de novo review on appeal. Miller v. Premier Corp., 608 F.2d 973, 981 & n. 8 (4th Cir.1979). The question is not whether there is no evidence, but whether there is sufficient evidence upon which a jury can properly return a verdict. Id.; see also Edmunds, 241 F.2d at 167.
 
 
 32
 There was no appeal from that part of the district court's holding that a jury could have concluded that by June 5, 1976 the negotiations with Burris had reached a stage at which the plaintiff would have considered such information important in deciding whether he should sell his interest to the defendant for $3 million. No exception having been taken, we do not consider this point.
 
 
 33
 The $17 million offer contained in the Burris letter of September 10, 1976 had not been made or discussed when the plaintiff sold his interests. As of June 5, 1976, defendant knew, and did not advise the plaintiff, that Burris would pay $5 million in cash, plus a royalty. The September 10, 1976 letter stated that the Burris offer replaced the original $5 million plus a royalty offer and set forth the exact terms of the final offer made by Burris. It is interesting that the $5 million in cash and the royalty were still a part of the offer, but the crux of the offer, and the turning point of this case, is whether the offer was conditioned upon the existing mineral leases being canceled at the time of closing, or whether the purchaser would take the properties subject to the outstanding leases to Iaeger Mining, U.S. Steel, Cabot Oil & Gas, and Uncle Jake's. There is also the question of whether the mining equipment on the land and in the mines was included in the purchase price and was required to have been delivered by the sellers. Interpretation of an unambiguous document is for the court and not for the jury. In Management Systems Associates v. McDonnell Douglas Corp., 762 F.2d 1161 (4th Cir.1985), we stated:
 
 
 34
 It is settled principle that the construction of the Agreement and its relation to the leases was one normally for the court itself. It follows that, whether the Purchase Agreement had the effect for which MSA contended or not was a question to be resolved by the district judge unless he should have found the language of the written documents ambiguous, in which event he should have left their construction to the jury under proper instructions.
 
 
 35
 Id. at 1167 (construing a computer software purchasing and leasing agreement). In the present action the district court found:
 
 
 36
 The letter of September 10, 1976, in plain and unambiguous terms, specified good and marketable fee simple title to the Lasher tracts of real estate, together with all other real and personal property then used in connection with the production or marketing of coal from the Lasher tracts. The latter clause, relating to all other real and personal property, clearly included the equipment. [footnote omitted]
 
 
 37
 The court concluded that the Burris proposal was "virtually valueless" because the $17 million would be consumed in paying off debts and buying leases and mining equipment to comply with the requirements of good and marketable fee simple title to all real property and delivery of personal property. Since the offer would have provided nothing approaching the $3 million plaintiff received when he sold to the defendant, the court found that he had not been damaged. In Rochelle v. Marine Midland Grace Trust Co., 535 F.2d 523, 529 (9th Cir.1976), the court held that there can be no Rule 10b-5 liability without proof of financial loss, and we find that rule persuasive in the instant case.
 
 
 38
 Appellant attempts to create an ambiguity in the terms of the offer by arguing what he thinks the language of the September 10, 1976 letter meant and what he thinks the parties intended. He has undertaken a difficult task, because the letter was not written by him nor was it addressed to him. It was written more than three months after he had sold his interest, and he never had any dealings with the letter's author.
 
 
 39
 He claims that the trial judge made findings on disputed issues of fact when he concluded that the $17 million offer would be consumed in complying with the terms of the offer. The trial judge did not adopt the defendant's position, with its underlying assumptions of fact, that it would cost $24,220,000 to deliver the property listed in the Burris offer. The trial judge used values that were not in dispute, and only used a part of the leases encumbering the property to determine that the offer was of little or no value. There was no evidence that Burris ever indicated a willingness to pay more than the $17 million mentioned in the letter.
 
 
 40
 Appellant also attempts to create ambiguity by arguing the meaning of such terms as "good and marketable fee simple title," but the authorities do not assist him. A "marketable title" is one which is free from encumbrances. Presidential Gardens/Duke St. Ltd. Partnership v. Salisbury Slye, Ltd., 802 F.2d 106, 110 (4th Cir.1986) (quoting Madbeth, Inc. v. Weade, 204 Va. 199, 202, 129 S.E.2d 667, 669-70 (1963)); see Black's Law Dictionary 875 (5th ed. 1979). A "marketable title" is one that is free from reasonable objection to a purchaser. Bowden v. Lainq, 103 W.Va. 733, 740, 138 S.E. 449, 452 (1927). The outstanding leases would constitute encumbrances under the law and under the clear language of the offer.
 
 
 41
 In West Virginia Dep't of Highways v. Farmer, 159 W.Va. 823, 825, 226 S.E.2d 717, 719 (1976), the court stated: "It has long been held that where language in a deed is unambiguous there is no need for construction and it is the duty of the court to give to every word its usual meaning." In the present case we are not dealing with the deed itself, but with the offer. The language of the offer, however, is clear and each word should receive its usual meaning. The offer requires "good and marketable fee simple title to the lands (including coal, oil, gas and other minerals) ..., known as the Lasher A tract, ... and the Lasher B tract, ... exclusive of and subject to the present surface and timber rights of Coastal Lumber Company, together with all other real and personal property presently used in connection with the production or marketing of coal from either or both of these tracts." It is obvious that the offer excludes from the good and marketable requirement "the present surface and timber rights of Coastal Lumber Company," but it requires the delivery of all other personal and real property used in connection with the production of marketing of coal on either of the Lasher Tracts.
 
 
 42
 Appellant argues that "together with" should be construed as words of exclusion and it should be considered as a part of the "subject to" clause of the letter. Such an interpretation would produce a forced and unnatural reading of something that is basically clear. "Together with" is described at 86 C.J.S. Together, at 911 (1954) (footnotes omitted) as "[a] copulative expression, importing a close and inseparable union, and defined as meaning in union, combination, or company with; in company or mixture with; along with; added to. 'Together with' is sometimes defined by the application of meanings of the word 'together,' such as, by combined effort; conjointly."
 
 
 43
 The testimony of Burris reflects his intention that the letter speak for itself. He explained his purpose in making the offer was to buy the coal reserves, have them contract mined, and deliver the coal to European customers.
 
 
 44
 We agree with the district judge that the terms of the letter are clear and unambiguous, that the offer was dependent upon a transfer of title clear of all encumbrances (except the surface and timber rights of Coastal Lumber), and, as such, that the appellant's share of such a sale, if it had been consummated, would have been considerably less than he received in his sale to the defendant.
 
 IV
 
 45
 There was no error in the district court's charge that Stuckey's K & P stock was a security, but that his interest in the partnership and its Lasher Tract minerals did not qualify as securities under the 1934 Act. Although appellant claims that these rights and interests were investment contracts, they do not meet the test set forth in SEC v. W.J. Howey Co., 328 U.S. 293 (1946).[1] Howey defines an investment contract as follows:
 
 
 46
 By including an investment contract within the scope of Sec. 2(1) of the Securities Act, Congress was using a term the meaning of which had been crystallized by this prior judicial interpretation. [referring to the formulation in State v. Gopher Tire & Rubber Co., 146 Minn. 52, 56, 177 N.W. 937, 938 (1920) ] It is therefore reasonable to attach that meaning to the term as used by Congress, especially since such a definition is consistent with the statutory aims. In other words, an investment contract for the purposes of the Securities Act means a contract, transaction or scheme whereby a person invests his money in a common enterprise and is led to expect profits solely from the efforts of the promoter or a third party, it being immaterial whether the shares in the enterprise are evidenced by formal certificates or by nominal interests in the physical assets employed in the enterprise.
 
 
 47
 328 U.S. at 298-99. It is clear that Stuckey and his partners took a very active part in the management of the partnership and its business activities.
 
 
 48
 We have recently faced this issue in Rivanna Trawlers Unlimited v. Thompson Trawlers, Inc., 840 F.2d 236 (4th Cir.1988). Justice Powell, sitting by designation, found that the partnership interests at issue were not investment contracts because they did not meet the third prong of the Howey test, since there was not the expectation of profits derived solely from the efforts of others. Our court stated:
 
 
 49
 General partnerships ordinarily are not considered investment contracts because they grant partners--the investors--control over significant decisions of the enterprise. Deutsch Energy Co. v. Mazur, 813 F.2d 1567, 1570 (9th Cir.1987); Goodwin v. Elkins & Co., 730 F.2d 99, 102-03 (3rd Cir.), cert. denied, 469 U.S. 831, 105 S.Ct. 118, 83 L.Ed.2d 61 (1984); Odom v. Slavik, 703 F.2d 212, 215 (6th Cir.1983); Gordon v. Terry, 684 F.2d 736, 741 (11th Cir.1982), cert. denied, 459 U.S. 1203, 103 S.Ct. 1188, 75 L.Ed.2d 434 (1983); Williamson v. Tucker, 645 F.2d 404, 422 (5th Cir.), cert. denied, 454 U.S. 897, 102 S.Ct. 396, 70 L.Ed.2d 212 (1981). In Williamson, a leading case, the Fifth Circuit identified a narrow exception to the strong presumption that a general partnership is not a security. The court stated that:
 
 
 50
 ... a partnership can be an investment contract only when the partners are so dependent on a particular manager that they cannot replace him or otherwise exercise ultimate control.
 
 
 51
 Id. at 424 (emphasis added). Only when this degree of dependency by the partners exists is there an investment contract. Id. at 423. Moreover, the court emphasized that "[t]he delegation of rights and duties--standing alone--does not give rise to the sort of dependence on others which underlies the third prong of the Howey test." Id. In other words, the mere choice by a partner to remain passive is not sufficient to create a security interest. The critical inquiry is, "whether the powers possessed by the [general partners] in the [partnership agreement] were so significant that, regardless of the degree to which such powers were exercised, the investments could not have premised on a reasonable expectation of profits to be derived from the management efforts of others." Id. at 419.
 
 
 52
 We agree with the Fifth Circuit, as well as the other circuits that appear to have embraced the Williamson reasoning, that only under certain limited circumstances can an investor's general partnership interest be characterized as an investment contract. A court must examine a partnership agreement and circumstances of a particular partnership to determine the reality of the contractual rights of the general partners.
 
 
 53
 480 F.2d at 240-41 (footnotes omitted). An examination of the original partnership agreement of Moore, Deal, King, and Stuckey does not establish a general partner and does not allocate specific powers to anyone of the partners, but provides:
 
 
 54
 ... no one of the partners shall be bound to devote all of his business time to the affairs of the partnership, but each partner shall devote so much of his time thereto as may be necessary to the proper and efficient conduct of the business of the partnership.
 
 
 55
 When Geupel bought the interest of Moore, the partnership agreement was amended and provided for the appointment of a "managing partner," but the powers given to the managing partner were not sufficient to meet either the Howey test or the Williamson language we adopted in Rivanna. In fact, Stuckey had a very active part in the management of the partnership, and at one time was the managing partner.
 
 
 56
 The sale of Stuckey's mineral interest in the Lasher Tract was not the sale of a security under the 1934 Act. The isolated sale of a mineral interest is not within the scope of the Act. Ballard & Cordell Corp. v. Zoller & Danneberg Exploration, Ltd., 544 F.2d 1059, 1064 (10th Cir.1976), cert. denied, 431 U.S. 965 (1977). In SEC v. C.M. Joiner Leasing Corp., 320 U.S. 344, 352 (1943), the Court stated that the Act covered "only that form of splitting up of mineral interests which had been most utilized for speculative purposes." A partnership arrangement with only four partners is not the type utilized for speculative purposes and is not covered.
 
 V
 
 57
 Appellant raised the issue of whether there was evidence to support a jury verdict of $2.1 million on the 1934 Act claim, when the only "security" sold was Stuckey's K & P stock. The jury verdict found all of the damages "under ... the Securities [Exchange] Act with respect to the June 5, 1976, transaction." At the time of the sale, the corporation had a negative net worth and had built a small tipple on land that it did not own. The district court did not address this issue, and it is not necessary that we do so, since we agree that there was no proof of damages.
 
 
 58
 For the foregoing reasons the judgment of the district court is
 
 
 59
 AFFIRMED.
 
 
 
 [1]
 Because of the nearly identical definitions of the term "security" in both the Securities Act of 1933 ("1933 Act"), at 15 U.S.C. Sec. 77b(1) (1982), and the 1934 Act, at 15 U.S.C. Sec. 77c(a)(10), we may look at cases construing the term "securities," particularly "investment contracts," under the 1933 Act for purposes of our inquiry here under the 1934 Act. See International Bhd. of Teamsters v. Daniel, 439 U.S. 551, 556 n. 7 (1979); United Hous. Found. v. Forman, 421 U.S. 837, 847 n. 12 (1975)